Steven Lamont GAINES, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–87–01192–1387–CR.

Court of Appeals of Texas,
Dallas.

March 6, 1990.

Don Driscoll, Dallas, Renie McClellan, Cedar Hill, for appellant.

Robert P. Abbott, Dallas, for appellee.

Before HOWELL, LAGARDE and WHITTINGTON, JJ.

## OPINION

WHITTINGTON, Justice.

A jury convicted Steven Lamont Gaines of aggravated robbery and assessed his punishment at sixty years' confinement in the Texas Department of Corrections. The trial court revoked appellant's probation in a prior burglary of a vehicle case and assessed his punishment at four years' confinement. Appellant raises five points of error, claiming that: 1) the trial court abused it discretion by denying his request to distribute a juror questionnaire prior to the beginning of voir dire; 2) the trial court erred in allowing the State to cross-examine witnesses at the punishment stage of the trial regarding whether appellant's conviction would affect their testimony; 3) the trial court erred in allowing an in-court identification of appellant because it was tainted by an out-of-court identification; 4) the trial court erred in admitting evidence of an extraneous offense; and 5) the trial court erred by allowing into evidence testimony concerning offenses committed by individuals other than appellant. We affirm.

In his first point of error, appellant argues that the trial court abused its discretion by denying his request to distribute juror questionnaires prior to the beginning of voir dire. However, the transcript reflects that appellant's motion to allow the use of juror questionnaires was granted. The record of voir dire proceedings does not reflect that this matter was discussed or that any adverse ruling was obtained.

■ In order to preserve a complaint for appellate review, a party must present to the trial court a timely motion and obtain an adverse ruling. TEX.R.APP.P. 52(a). When no adverse ruling is obtained, nothing is presented for review. *Terry v.*

**928**

*State,* 517 S.W.2d 554, 557 (Tex.Crim.App. 1975). We overrule this point of error.

In his second point of error, appellant argues that the trial court erred by allowing the State to question a witness, Victor McRea, called by appellant at the punishment stage of trial regarding whether or not appellant's conviction in the instant offense would affect his testimony. At the punishment phase, the following transpired:

DEFENSE COUNSEL: Do you understand that this jury has just convicted your friend, Steven Gaines, of aggravated robbery?

THE WITNESS: All right.

DEFENSE COUNSEL: Do you know that, sir?

THE WITNESS: Okay.

DEFENSE COUNSEL: I am telling you they have.

THE WITNESS: Okay.

\* \* \* \* \* \*

DEFENSE COUNSEL: Do you want to tell this jury something about your friend, Steven Gaines?

THE WITNESS: Well, yes. You know, the years—all the years I have known Steve, I have never really known him to [sic] such a thing as this. When I heard what had happened, I was stunned because I never knew him in the neighborhood to fight.

PROSECUTOR: Object to being non-responsive.

THE COURT: Sustained.

DEFENSE COUNSEL: Is he a violent person?

THE WITNESS: I have never known him to be a violent person.

PROSECUTOR: I will object—well, I won't object to that.

THE WITNESS: I have never known him to have a hot temper or anything like that. You know, he was always—

PROSECUTOR: Object to being non-responsive.

THE COURT: Sustained.

\* \* \* \* \* \*

During cross-examination concerning appellant's conviction for burglary of a vehicle, McRea testified as follows:

PROSECUTOR: With intent to commit theft or some felony while breaking into a vehicle?

THE WITNESS: That is right.

PROSECUTOR: That is bad, isn't it?

THE WITNESS: Yea, it is bad.

PROSECUTOR: And you indicated that you would want him in your home?

THE WITNESS: Yes, uh-huh.

PROSECUTOR: You would want him in your home knowing he took a hatchet and put it on a man's neck?

THE WITNESS: Yes, uh-huh.

PROSECUTOR: All right. That doesn't bother you any?

THE WITNESS: No, it sure don't.

PROSECUTOR: It doesn't bother you, does it?

THE WITNESS: No.

PROSECUTOR: And it doesn't bother you that he was out at White Rock Lake and he hit people with a hatchet and hit them in the head with a hatchet?

THE WITNESS: No, it sure don't.

DEFENSE COUNSEL: May it please the Court, I am going to object to this line of questioning. The matter before the jury is the appropriate punishment for the offense of aggravated robbery, as alleged in the indictment in the case.

THE COURT: Overruled.

PROSECUTOR: Now, you would want him in your home knowing that, wouldn't you?

THE WITNESS: Yeah.

PROSECUTOR: That doesn't bother you?

THE WITNESS: No.

PROSECUTOR: It doesn't bother you that some women were hit with a hatchet by your friend down here, does it?

THE WITNESS: No, it sure don't.

\* \* \* \* \* \*

PROSECUTOR: All right. And you still want Steven Gaines in your house knowing that he, at hatchet point, made a woman take his penis in her mouth and he ejaculated in it?

THE WITNESS: Uh-huh.

PROSECUTOR: That doesn't bother you, does it?

THE WITNESS: No.

Appellant's objections at trial came only after the complained of questions had been asked and answered. A party must make a timely and specific objection to preserve a complaint for appellate review. TEX.R. APP.P. 52(a). In order to be timely, the objection must be made as soon as the ground becomes apparent. *Thompson v. State*, 691 S.W.2d 627, 635 (Tex.Crim.App. 1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985). Appellant's objection was not timely. Further, appellant later failed to object to the State's later cross-examination of the same witness about whether he was "bothered" that appellant had assaulted and beaten a woman with a hatchet. Because the same evidence objected to was subsequently admitted without objection, any error was rendered harmless. *Anderson v. State*, 717 S.W.2d 622, 628 (Tex.Crim.App.1986). We overrule appellant's second point of error.

■ In his third point of error, appellant contends that the trial court erred in allowing the impermissible in-court identification of appellant for the reason that it was tainted by out-of-court identification procedures. Appellant complains that he was the only person in a yellow tank top in the photographic line-ups shown to M.B, A.H., and Steve Montana. M.B., A.H., and Steve Montana had told police that one of the attackers was wearing a yellow tank top. Convictions based on eyewitness identification testimony will be set aside because of a pretrial photographic lineup only if the identification procedure: (1) was impermissibly suggestive, and (2) gave rise to a substantial likelihood of misidentification. *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968); *Turner v. State*, 614 S.W.2d 144, 146 (Tex.Crim.App.1981). Whether a pretrial procedure fatally tainted the in-court identification of the accused so as to deny him due process must be evaluated in light of the totality of the surrounding circumstances. *Jackson v. State*, 657 S.W.2d 123, 127 (Tex.Crim.App.1983). Factors considered in determining the origin of in-court identification testimony include the opportunity of the witness to observe the defendant, the degree of attention, the accuracy of any physical descriptions, the degree of certainty, and the amount of time between the offense and the identification of the accused. *Jackson*, 657 S.W.2d at 129; *Ross v. State*, 715 S.W.2d 55, 56 (Tex.App.—Dallas 1986, no pet.). Absent clear and convincing evidence that the in-court identification is tainted by improper pretrial procedures, testimony identifying the defendant is always admissible. *Holloway v. State*, 691 S.W.2d 608, 615 (Tex.Crim.App.1984).

■ A.H., Steve Montana, and M.B. each testified at a separate hearing conducted outside of the jury's presence to the circumstances surrounding their identification of appellant. They all testified that the parking lot where the robbery occurred was well-lighted; and each identification witness was, at some point, close to appellant. All three witnesses said that appellant was the assailant carrying a hatchet and wearing a yellow tank top, alternatively referred to as a "muscle shirt." A.H. picked out appellant from a set of six photographs depicting black men of approximately the same age. Although appellant was the only individual pictured in a yellow tank top, A.H. testified that her identification was based strictly on recognizing appellant's face from the time of the offense. Steve Montana and M.B. also selected appellant's picture from a group of six similar photographs based on their recollection of the events. After examining the factors delineated in *Jackson*, we hold that the in-court identification was not tainted by improper pretrial procedures. *Jackson*,

657 S.W.2d at 129; *Holloway,* 691 S.W.2d at 615. We overrule this point of error.

In his fourth point of error, appellant asserts that the trial court erred in admitting evidence of extraneous offenses committed by appellant. The accused may not be tried for some collateral crime or for being a criminal generally. *Williams v. State,* 662 S.W.2d 344, 346 (Tex.Crim.App. 1983). The admissibility of an extraneous offense is controlled by a two-step test: the evidence must (1) be relevant to a material issue in the case, and (2) possess probative value which outweighs its inflammatory or prejudicial effect. *Robinson v. State,* 701 S.W.2d 895, 896 (Tex.Crim.App.1986); *Williams,* 662 S.W.2d at 346. Where an offense is one continuous transaction, however, or another criminal act is part of the case on trial or closely interwoven, then proof of all the facts is proper. *Moreno v. State,* 721 S.W.2d 295, 301 (Tex.Crim.App. 1986); *Archer v. State,* 607 S.W.2d 539, 542 (Tex.Crim.App.1980), *cert. denied,* 452 U.S. 908, 101 S.Ct. 3037, 69 L.Ed.2d 410 (1981). Sometimes called "res gestae," an extraneous offense in this circumstance becomes admissible to show the context in which the indicted criminal act occurred because the jury is entitled to hear what happened immediately before and after the offense to realistically evaluate the evidence. *Mitchell v. State,* 650 S.W.2d 801, 811 (Tex.Crim. App.1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984); *Albrecht v. State,* 486 S.W.2d 97, 100 (Tex.Crim.App. 1972). The record reflects that the complainant, A.H., and her companions were walking through a wooded area near the spillway at White Rock Lake. A.H. testified that she, M.B., Steve Montana, and Steve Unruh were out at White Rock Lake on July 20, 1987. They were heading back to Steve Montana's van when she heard yelling and ran ahead to see what was happening. She said that it sounded like people were fighting. The record further reflects that Edward Mulder and another fisherman were being robbed and assaulted by the appellant and his associates and

their cries of pain were heard by the complainant. She and her companions had been unaware of the defendants until this time when they heard the outcries and went to find out what was going on. When they ran toward the area where the events were taking place, it was then that she and her companions were accosted by appellant and his associates. She testified that she was confronted by appellant, who was carrying a hatchet and who asked for her "fishing license." She said that she was near an area where people fish. She identified appellant in open court as the man with the hatchet.

She further testified that after appellant confronted her, he called out to his companions, "here they are, they're over here." He then called her a "white whore" and hit her with his hatchet when she tried to escape into Steve Montana's van. He ripped off her shirt and repeatedly struck M.B.

A.H. further testified that appellant ordered both girls to take off their clothes. Meanwhile, appellant's companions beat Steve Montana and Steve Unruh with a tire iron and axe. Appellant then took the girls' jewelry from them. Appellant helped his companions beat Steve Montana while others watched over A.H. and M.B. The girls were sexually assaulted. Appellant sexually assaulted M.B. and others sexually assaulted A.H. These events were a group of actions in the crime spree jointly engaged in by appellant and his companions. The events were so closely interwoven as to be admissible to show the context in which the offenses occurred. *Maynard v. State,* 685 S.W.2d 60, 67 (Tex.Crim.App. 1984).

Even if the admission of the extraneous offenses was error, it was harmless. This court need not reverse a case due to trial error provided that we find "beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment." Tex.R.App.P. 81(b)(2). It can safely be said that the evidence of which appellant does not complain is so over-

whelming and the facts so egregious that the alleged error made no such contribution to either conviction or punishment. Appellant's fourth point of error is overruled.

In his fifth point of error, appellant contends that the trial court erred in allowing into evidence testimony concerning offenses committed by individuals other than appellant. Appellant complains of evidence that other individuals sexually assaulted A.H., assaulted Steve Montana, sexually assaulted M.B., and robbed Edward Mulder.

 Evidence of extraneous offenses should not be introduced unless and until it is shown that the accused participated. *Ingham v. State*, 679 S.W.2d 503, 507 (Tex.Crim.App.1984). In this case, the State showed that appellant was a party to all of the extraneous offenses committed by his companions. A.H. testified that appellant held up the hatchet and told her and M.B. to get their "fucking clothes off now." He then took M.B.'s earrings from her. A.H. said that appellant fought with Steve Montana on the ground while one of his companions touched her all over her body. She testified that two of appellant's companions were also hitting and kicking Steve Montana. A.H. testified that after one of appellant's companions raped and beat her, she saw appellant and another man with M.B. She had asked the man who was raping her to tell "them" to stop hitting M.B. because she could hear her screaming in pain. The attacker complied. When she next saw Steve Montana, he was bloody and his front teeth had been knocked out.

Appellant's participation in all of these events demonstrated that he was acting in concert with his companions. Although Edward Mulder was not able to identify who had beaten and robbed him, A.H. testified that she had run up to the area near where Edward Mulder was attacked because she heard yelling. At that point she and her companions were attacked. She later saw men lying down near a fishing area. Edward Mulder could hear female voices screaming while he was lying face down as he was instructed to do by his attackers. We hold, therefore, the evidence of the extraneous offenses was admissible. *See Smith v. State*, 547 S.W.2d 6, 11 (Tex.Crim.App.1977); *Heathcort v. State*, 709 S.W.2d 303, 306 (Tex.App.—San Antonio 1986, no pet.). We overrule appellant's fifth point of error.

The judgment is affirmed.

HOWELL, Justice, dissenting.

I dissent. This case must be reversed because the actus reus, the unlawful deed spelled out in the indictment, was totally submerged in a sea of collateral evidence concerning (1) misconduct directed against others and (2) misconduct committed by others. None of this misconduct evidence was independently probative of any specific element of the offense charged, which was aggravated robbery of a necklace from complainant A.H.[1] No balancing test was applied; at least, the balance was totally skewed. Finally, the case was a direct evidence case; where the State has no need to resort to circumstantial evidence, it has no need to introduce uncharged misconduct evidence.

### SUMMARY OF THE EVIDENCE

The recitation of the evidence contained in the majority opinion is inadequate for the understanding of this dissent. The events in question occurred primarily at White Rock Lake Park, located in Dallas. At the entrance, there is a large parking lot which, according to the State's evidence, was well lighted. The lake or its outflow is situated a short distance from one side of this lot at which point there is a place to fish. A large tree is situated on another side of the parking lot. On yet another side, there is a footbridge which connects to a paved pathway through a wooded area leading to the spillway, a short walking distance removed.

1. This opinion employs initials for the complainant and her female companion.

Just after sundown on July 20, 1987, complainant and her friend, M.B., both of them 17, arrived in a Chevrolet van driven by complainant's cousin, Steve Montana. His friend, Steve Unruh, was also in the party. They parked the van on the lot and walked to the spillway where they spent about an hour and a half drinking beer and visiting together.

Edward Mulder was also at the lake on that evening. He likewise parked his vehicle, a Ford pickup, on the same lot and began fishing in the area near the side of the parking lot. At least one other person was also fishing only a few feet away.

The record is silent as to when or how appellant arrived, but it is a logical assumption that he arrived along with Gary Briggs in a Ford Escort that Briggs owned. Seemingly, there were one or more others in the car. The State's witnesses were unclear as to the total number of persons attacking them, variously placing the number between three and six. The Ford Escort was parked on the same lot.

According to the State's theory of the case, appellant and his companions first attacked and robbed the fishermen. They held a hatchet blade to Mulder's throat and took his wallet and car keys; he was seriously cut. After robbing the fishermen, the assailants forced them to lie on the ground; they kicked and beat them; they threatened them with death if they moved.

As the robbery and assault of the fishermen was being concluded, complainant and her companions were returning from the spillway through the wooded area to the footbridge and the parking lot. They heard a commotion, and complainant ran ahead to see what was happening. As she came over the footbridge toward the parking lot, appellant came running at her with a hatchet in one hand and a bottle of whiskey in the other. He declared that he was a policeman and demanded to see her fishing license. When she protested that she had not been fishing, he declared that he was conducting a "drug bust."

Montana became suspicious and alarmed. He attempted to get everyone into the van, but he was attacked by appellant or his companions. Montana was viciously beaten and collapsed. Apparently, Unruh was beaten; it appears that he became unconscious.

While the two men were being attacked, the two young women were being assaulted. Appellant struck complainant with the blunt side of the hatchet; he fondled her, verbally abused her, and announced his intent to commit rape upon her. During this course of conduct, which occurred while complainant and appellant were beside the van, appellant forcibly took the necklace mentioned in the indictment from her neck.

Before appellant ever carried out his announced objective of raping complainant, he turned his attention to M.B. Instead, one of appellant's companions forced complainant to accompany him across the footbridge and into the wooded area where he proceeded to ravish her. This assailant stripped off complainant's clothes, pulled out her Tampax, and, having forced her to the ground, placed his male organ into her female organ until he ejaculated. He kept asking her if she liked it and when she refused to answer, he struck her in the face. Finally, there was a loud car crash on the parking lot. The assailant jumped up, pulled up his pants, thanked complainant for "a good fuck" and left. Complainant, attired only in a pair of panties and tennis shoes, ran in another direction through the wooded area, waded across the spillway, climbed the wall on the opposite side, went out into the opposite street, and managed to hail a motorist who carried her to the closest point from which the police could be called.

In the meantime, appellant and one of his companions was assaulting M.B. They took her under the large tree at the side of the parking lot. Appellant beat M.B. with the hatchet and with his hands. The companion beat and kicked M.B. Appellant took her bracelets, earrings and necklace. The companion proceeded to rape M.B. Then the companion held M.B. and forced

her to commit fellatio upon appellant; he ejaculated into her mouth.

Thereafter, appellant and his companions left the parking lot in two vehicles, the Ford Escort owned by Gary Briggs and fisherman Mulder's Ford pickup. The police arrived at the scene immediately afterwards. As a part of their investigation, they found appellant's fingerprints on Montana's Chevrolet van. Less than an hour later, Briggs' Escort was found wrecked and abandoned approximately five or ten minutes driving time away from the park. Several items stolen from Montana were found in the car along with the hatchet that had been used by appellant. Appellant was arrested about three hours after he left the parking lot. He was driving Mulder's pickup slowly along a street in east Dallas and calling to a woman who was walking along the sidewalk. He was spotted by a patrolman pursuant to a radio alarm for a stolen vehicle. At the time of arrest, appellant was wearing complainant's necklace. The keys to the wrecked Escort were found in the seat of the Mulder pickup. One of appellant's companions from White Rock Lake Park was riding with appellant at the time of arrest.

### THE OTHER MISCONDUCT PLACED IN EVIDENCE WAS WITHOUT PROBATIVE VALUE

The accused may not be tried for some collateral crime or for being a criminal generally. *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Crim.App.1983). In order to be admissible, uncharged or extraneous evidence must satisfy two conditions: (1) it must be relevant to a material issue in the case; and (2) it must possess probative value that outweighs its inflammatory or prejudicial effect. *Robinson v. State*, 701 S.W.2d 895, 896 (Tex.Crim.App.1986); *Williams*, 662 S.W.2d at 346. The defendant is entitled to be tried upon the accusation made by the State's pleading. *Smith v. State*, 646 S.W.2d 452, 455 (Tex.Crim. App. [Panel Op.] 1983); *Loudres v. State*, 614 S.W.2d 407, 411 (Tex.Crim.App.1980)

(Phillips, J., concurring). He may not be required to defend himself against charges that he has not been notified that he would be required to answer. *See Smith*, 646 S.W.2d at 458; *Ford v. State*, 484 S.W.2d 727, 730 (Tex.Crim.App.1972).

To be sure, the rule against evidence of uncharged misconduct has many exceptions. However, these exceptions rarely come into play unless (1) the State relies on circumstantial evidence, or (2) the defendant's state of mind cannot be established from the actus reus itself, or (3) some defensive theory makes the uncharged misconduct admissible. None of these exceptions can be seriously argued in the case at hand.

This was not a circumstantial evidence case. Complainant gave direct and unequivocal testimony that appellant was the person who took the necklace from her and that he took it by force and threats. Montana and M.B. substantially corroborated her testimony; Unruh did not testify. Defendant's attorney through his cross-examination questioned the adequacy of the light in the parking lot and other factors attacking the witnesses' ability to positively identify appellant as the culprit. However, complainant and her companions were unequivocal in their testimony that the light was adequate. Their testimony was corroborated by the fact that appellant's fingerprints were found on Montana's van and the fact that, when arrested, appellant was wearing complainant's necklace. Thus, there was direct evidence that the offense was committed, that defendant was the offender, and that he performed the act with the necessary state of mind to make the act a criminal offense. The resort to secondary or indirect evidence was unnecessary.

Insofar as defensive theories were concerned, defendant called no witnesses. Cross-examination of the State's witnesses was centered upon the identification question. Final argument concentrated upon reasonable doubt. If this type of defense serves to make uncharged misconduct ad-

missible, the rule against the use of uncharged misconduct has become hollow. The probative value to the State of the uncharged misconduct evidence was virtually nil. On the other hand, the improperly prejudicial value of such evidence was great.

## THE TEMPORAL PROXIMITY OF THE UNCHARGED MISCONDUCT WAS INSUFFICIENT

Our majority has made no effort to find probative value in the uncharged misconduct. Instead, it has resorted to the so-called "res gestae" exception to the rule against admission of uncharged misconduct evidence. Unfortunately, the cases in this area are in utter disarray. However, no Texas case can be found that goes as far as the majority in the name of "res gestae."

Perhaps the most definitive and exhaustive work that has been written on the subject of uncharged misconduct is Professor Imwinkelried's book. *See* E. Imwinkelried, Uncharged Misconduct Evidence (1984) (hereafter Imwinkelried). In general, he advocates and supports the wide use of uncharged misconduct evidence whenever it has probative effect. However, he vigorously attacks the res gestae exception as being a legal anomaly with little or no substance. *See id.* §§ 6.20–6.25.[2]

Imwinkelried attempts to fit the cases into three categories. First, he states that many courts justify the exception allowing the admission of concurrent misconduct simply "by invoking the magic incantation, res gestae." *Id.* § 6.20. However, he urges that the res gestae concept as historically developed "has no significance whatsoever in the analysis of the question whether the evidence satisfies ... the common-law uncharged misconduct doctrine.... It is both unsound and unnecessary to invoke the res gestae doctrine here." *Id.*

Citing Texas cases, in part, Imwinkelried states:

In the view of some courts, evidence of the uncharged crime is admissible so long as in a temporal sense, the charged and uncharged crimes were coincident, concurrent, contemporaneous, or simultaneous. These courts reason that the uncharged act is a surrounding circumstance of the charged crime. They assert that the two crimes constitute a single criminal episode and that the jurors cannot evaluate the charged crime in a vacuum without its context, the uncharged crime.

*Id.* § 6.22. Singling out this jurisdiction, he charges that "Texas cases apply the doctrine in the most doctrinaire fashion." *Id.* However, all but one of the cases cited in support of his proposition are intermediate court decisions. The only case from the Court of Criminal Appeals, *Dowdy v. State*, 385 S.W.2d 678 (Tex.Crim.App.1964), is twenty-five years old. As discussed below, our Court of Criminal Appeals has visited the topic many times since then.

Discussing his second category, Imwinkelried states that other less absolutist courts hold for the admissibility of uncharged misconduct regardless of probative value "so long as the uncharged act is part of an uninterrupted chain, sequence, or series of events.... [and the] uncharged and charged crimes [are] closely connected, substantially contemporaneous, and part of the history of the charged act or one continuous episode.... [T]hese courts argue that events do not occur in a vacuum and that the jurors need to know about the uncharged act to realistically evaluate the evidence." Imwinkelried § 6.23.

Ironically, he cites many Texas decisions in the discussion of his second category which illustrate the difficulty in reconciling

---

**2.** An extensive collation and discussion of Texas cases on the admissibility of uncharged misconduct evidence also exists. *See* McColl & McCormack, Extraneous Offenses & Uncharged Conduct (1986). This reference also discusses the "res gestae" exception to the rule against admissibility of uncharged misconduct, as applied in Texas. *See id.* at 6–3 through 6–9, 6–23 through 6–24.

Texas decisions on the use of the "res gestae" theory of admissibility. All but two of the Texas authorities cited in the discussion of Imwinkelried's second category (*Mitchell v. State*, 650 S.W.2d 801 (Tex. Crim.App.1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984); *Archer v. State*, 607 S.W.2d 539 (Tex.Crim. App.1980), *cert. denied*, 452 U.S. 908, 101 S.Ct. 3037, 69 L.Ed.2d 410 (1981)) are intermediate court decisions. The lapse of approximately fifteen years between the decisions of the Court of Criminal Appeals cited by Imwinkelried in his first and second categories illustrates a continuing metamorphosis in the position of the court.[3]

According to Imwinkelried, a third category of cases holds that uncharged misconduct without specific probative value is inadmissible unless it meets the test of "realistically inseparable or indivisible." IMWINKELRIED § 6.24, at 38. This third category he dubs "the rule of completeness." *Id.* "There is extensive case law recognizing this principle, and in a few states such as Nevada the principle has been codified." *Id.*

On the one hand, these courts hold that the judge must excise the reference to the uncharged act whenever feasible. Simultaneity is not enough to warrant admission in evidence. On the other hand, these courts admit the reference if the acts are inseparable linguistically, physically, or psychologically.

In some cases, the acts are linguistically inseparable. The witness testifying to the charged crime cannot practically avoid mentioning the uncharged act. The testimony would become awkward and the narrative might sound less believable if the witness were forced to avoid mentioning the uncharged act. The judge must exercise common sense and ask whether it would be too artificial to fragmentize the event. But unless the judge concludes that it would be impossi-

ble or difficult for the witness to narrate the charged crime without mentioning the uncharged act, the judge should bar any mention of the uncharged act. *Id.* at 38–39. Again illustrating the diversity of Texas authority, the author cites several Texas cases as falling within his third category. In this instance, three of his authorities are from the Court of Criminal Appeals. *See Bush v. State*, 628 S.W.2d 441, 443–44 (Tex.Crim.App.1982) (capital murder in course of burglary of pharmacy to obtain Preludin; reversed—court rejected State's contention of "res gestae" with regard to evidence that defendant was a user of Preludin; offenses must be "so connected that they constitute an indivisible criminal transaction"); *Bass v. State*, 622 S.W.2d 101, 104 (Tex.Crim.App.1981) (evidence that defendant fired murder weapon into neighbor's house two days previously was "in no way blended or closely interwoven [with the capital murder on trial] and thus cannot be termed res gestae;" conviction nevertheless affirmed; this collateral misdemeanor did not contribute to conviction or punishment), *cert. denied*, 456 U.S. 965, 102 S.Ct. 2046, 72 L.Ed.2d 491 (1982); *Jones v. State*, 472 S.W.2d 529 (Tex.Crim.App.1971) (other offenses admissible where "one continuous transaction" or "blended or closely interwoven").

Again, the fact that Imwinkelried finds Texas cases that fit within all three of his categories illustrates the lack of cohesiveness in Texas authorities. However, the fact that a number of the more recent authorities from the Texas Court of Criminal Appeals fall in category three appears to be significant.

Imwinkelried concludes from his analysis that there is a trend toward requiring independent logical relevance for the admission of uncharged misconduct:

The [first] two versions of the res gestae theory ... have been subjected to mounting criticism. "Res gestae" has been

---

**3.** Imwinkelried takes the view that, in many of the cases where the res gestae exception is invoked, the courts also find a probative basis for the uncharged conduct evidence. IMWINKELRIED § 6.24, at 38. "The courts often use the res gestae theory as a makeweight." *Id.*

characterized as a "mind numbing" Latin phrase. [Citing 2 LOUISELL & MUELLER, FEDERAL EVIDENCE § 140; 1 WIGMORE, EVIDENCE § 218 (3rd ed.).] . . . The ultimate test is logical relevance, and a temporal relation does not guarantee logical relevance. . . .

Since these criticisms of the first two versions of the res gestae theory have so much obvious merit, the trend has been toward the view . . . that the proffered uncharged misconduct evidence [must] be independently [and] logically relevant or inseparable from the charged crime. . . . Standing alone temporal simultaneity does not guarantee logical relevance. If the prosecutor's only stated justification for introducing the uncharged misconduct is that the uncharged and charged acts were contemporaneous, . . . the exclusion of the uncharged misconduct [is dictated].

IMWINKELRIED § 6.25.

Clearly, the Court of Criminal Appeals is following the trend identified by Imwinkelried. In *Bush*, the court declared that even if the uncharged misconduct meets the test of res gestae, it is nevertheless subject to the requirement that "the probative value . . . must outweigh its prejudicial effect." *Bush*, 628 S.W.2d at 443. In another case, the court held that "to qualify as 'res gestae' the . . . offenses must be so closely interwoven . . . [as to show] the context in which the offense occurred." *Maynard v. State*, 685 S.W.2d 60, 67 (Tex.Crim.App. 1984) (defendant parked car at complainant's house, committed burglary-rape, fled on foot; reversed for admitting evidence that car contained drugs and switchblade knife). The uncharged offense is inadmissible unless material, unless the accused participated in that offense, *and* unless relevance outweighs prejudice. *Wallace v. State*, 679 S.W.2d 1, 4 (Tex.Crim.App.1983) (police chased defendant's auto for traffic offense until it ran off road, defendant then attempted to shoot officer resulting in attempted capital murder prosecution; reversed for admitting evidence that drugs found in trunk). In yet another case, the court held that the State failed to carry its "heavy burden" to show that the accusation was "material, relevant and probative." *Smith v. State*, 646 S.W.2d 452, 458 (Tex.Crim.App.1983) (robbery, defendant arrested several hours later when woman jumped out of his auto complaining to nearby officer of attempted rape; woman's accusation admitted as "res gestae" to arrest; reversed).[4] In a case decided by a court of appeals, the defendant was arrested while driving his auto six months after the offense of heroin delivery. The conviction was reversed for admitting evidence that an inventory search disclosed cocaine and a handgun: "To qualify . . . as *res gestae* would require a finding that [the items in the car were] closely interwoven with the offense on trial." *See Nettles v. State*, 645 S.W.2d 909, 910 (Tex.App.—Fort Worth 1983, no pet.). Implicitly, *Nettles* has rejected res-gestae-to-the-arrest as an exception to the rule against the admission of uncharged misconduct.[5]

This dissent believes that the Court of Criminal Appeals is moving toward Im-

4. Consonant with Imwinkelried's approach, *Smith* roundly criticizes the use of the term "res gestae" as an excuse to avoid sound legal analysis. 646 S.W.2d at 455 n. 2, 456.

5. In addition to the exception styled as res-gestae-to-the-offense, various courts have recognized res-gestae-to-flight, res-gestae-to-arrest, and res-gestae-to-confession as grounds for the admission of uncharged misconduct evidence. The justifications advanced are the same, "whole picture," "complete context," "not in a vacuum," "jury entitled to know any facts that might extenuate or mitigate," etc. However, the relation of these latter classes of "res gestae" to the offense on trial is necessarily even more tenuous. For instance, the courts have long admitted evidence of flight as circumstantial evidence of fear of apprehension which in turn constitutes circumstantial evidence of guilty knowledge which in turn is circumstantial evidence that the defendant committed the charged offense. Adding evidence of uncharged misconduct to this already lengthy chain carries the chain of admissibility to the ultimate. Every chain of evidence must have a breaking point somewhere. Obviously, res gestae to a collateral event must approach, if it does not exceed, the outer limits on the rules of admissibility simply because of temporal proximity to an admissible event.

winkelried's third category. The temporal proximity exception to the rule against the admissibility of uncharged misconduct has been significantly narrowed. Temporal proximity, standing alone, is not enough to make uncharged misconduct admissible. The temporally proximate misconduct must either (1) meet the ordinary rule decreeing such evidence inadmissible unless it possesses definite and specific probative weight and its evidentiary value exceeds its prejudicial effect; or (2) it must be so inextricably intertwined with the offense on trial that its excision, if possible at all, would create an entirely false picture for the jury. In trending to the third category, the Court of Criminal Appeals is following the national trend.

## THE ACTS OUTSIDE OF COMPLAINANT'S IMMEDIATE PRESENCE WERE INADMISSIBLE

Having laid out the facts and having analyzed the applicable law, the final step is to apply the law to the facts. The events that transpired in the immediate presence of the complainant, those which she saw and heard to the extent that she was able to qualify as an eye witness and testify to them in reasonable detail as having transpired in her presence while she was being accosted and robbed, were a legitimate part of the robbery prosecution. Complainant's testimony of being accosted and the subsequent threats, assaults, abuse, and mistreatment up to the time that the necklace was taken from her possession were intrinsic to the robbery and were admissible without a specific showing of probative effect and without resort to any balancing test. Likewise, the attacks upon complainant's companions by appellant and his cohorts which occurred in complainant's immediate presence, as just defined, were clearly admissible as a necessary component of the robbery prosecution.

Complainant's companions were properly allowed to corroborate her testimony. It was proper for them to give any testimony that she overlooked or failed to recall, as long as it was testimony that she properly could have given. In this respect, it was proper for complainant's companions to provide details of the attacks upon themselves insofar as complainant could have observed those details.

However, the assault and robbery of the fishermen were not admissible under the temporal proximity exception. This conclusion is required by the fact that complainant and her companions had no prior or concurrent relationship with the fishermen, that neither complainant nor her companions directly observed those attacks or could have qualified as eyewitnesses, that complainant and her group were some distance away when the attacks on the fishermen occurred, and that such attacks were essentially concluded before appellant ever accosted complainant.

## THE CLEAR EVIDENCE REQUIREMENT WAS NOT MET

The attack on the fishermen was further inadmissible because there was no clear evidence of appellant's participation in that criminal episode. Fisherman Mulder testified that he could not recognize his assailants. There are only three factors that might have implicated appellant. The first was proximity. However, it is well settled that presence alone is insufficient proof of participation in criminal conduct occurring at a specific time and place. *Burns v. State*, 676 S.W.2d 118, 120 (Tex.Crim.App. 1984). The second was appellant's possession of a hatchet, Mulder having testified that a hatchet was held to his throat. However, no one identified the hatchet placed in evidence as the weapon used against Mulder. Suffice to say, there are many hatchets in this world. Thirdly, appellant was arrested three hours later while driving Mulder's truck. However, appellant might have easily come into possession of Mulder's truck by other means than assault on Mulder, as more fully discussed below.

It is well established that uncharged misconduct may not be placed in evidence un-

less the evidence is clear that the defendant is guilty of the uncharged offense. *Turner v. State,* 754 S.W.2d 668, 673 (Tex. Crim.App.1988); *Castillo v. State,* 739 S.W.2d 280, 289 (Tex.Crim.App.1987), *cert. denied,* 487 U.S. 1228, 108 S.Ct. 2889, 101 L.Ed.2d 924 (1988). It was not sufficiently clear that appellant was the offender in the attack upon the fishermen to admit evidence of this collateral incident into evidence in this prosecution for the robbery of complainant A.H. That does not necessarily mean that the evidence was insufficient to sustain a conviction for the robbery of Mulder, had such an offense been on trial. It simply means that all of the evidence tending to show that appellant assaulted and robbed the fishermen was circumstantial and that such evidence did not amount to a compelling circumstantial evidence case.

The requirement that proof of the uncharged misconduct be clear is an important requirement. The entire reason underlying the rule against the admission of uncharged misconduct is that it is manifestly unfair to force a defendant to simultaneously defend himself against multiple charges, as to one or more of which he may not have received sufficient notice of the particulars. Lacking eyewitness identification of the attackers, lacking positive identification of the weapon used in the assault, and having failed to exclude another reasonable explanation for appellant's possession of Mulder's truck, a jury could easily have acquitted him had he been on trial in the court below for the robbery-assault of the fishermen. Under such circumstances, appellant should not have been put in a position where he was forced to defend himself of the collateral crimes of robbery-assault upon the fishermen.

## THE RAPE OF COMPLAINANT WAS NOT SUFFICIENTLY PROXIMATE

In addition, the rape of complainant A.H. was not admissible under the temporal proximity exception. In reaching this conclusion, consider the fact that the offense occurred after the robbery on trial was substantially complete—complainant's necklace had already passed into the possession of appellant. Also, consider the fact that such offense occurred at a sufficient distance away from appellant's presence that his participation was minimal. In concluding that it was error to admit this offense into evidence, it is of particular concern to this writer that such attack was committed by another person for that person's own reasons and his own individual gratification. Again, the question is not whether appellant was in complicity with the rapist nor is it whether appellant could have been convicted as a party to the rape. The question is whether this uncharged crime, being committed by another, was intrinsic to the robbery offense on trial. It was not sufficiently intrinsic to warrant calling upon appellant to defend himself for the misconduct of another in the midst of the prosecution for a separate offense allegedly committed by appellant at a proximate but previous time against the same complainant.

## THE UNCHARGED MISCONDUCT OF OTHERS SHOULD HAVE BEEN EXCLUDED

The cases hold that uncharged misconduct of others may not be put in evidence unless the defendant on trial clearly participated therein. *Turner v. State,* 754 S.W.2d 668, 673 (Tex.Crim.App.1988); *Castillo v. State,* 739 S.W.2d 280, 289 (Tex. Crim.App.1987), *cert. denied,* 487 U.S. 1228, 108 S.Ct. 2889, 101 L.Ed.2d 924 (1988). Those cases, although not squarely on point, support the conclusion that the clearly severable offense of rape, by someone other than appellant, of this same complainant should not have been placed in evidence against appellant.

For similar reasons, the rape of M.B. by someone other than appellant should not have been put in evidence against this appellant in the prosecution against him for robbery of complainant A.H. It was also error to admit evidence that appellant

forced M.B. to commit fellatio upon him. Again, we have physical and temporal separation of the offense. Appellant's sexual assault upon M.B. occurred after the robbery was complete and after complainant had been taken across the footbridge and into the wooded area. The M.B. attack occurred under the tree on another side of the parking lot. A further and strong consideration for the exclusion of the M.B. assault was the fact that the offense was committed against another victim entirely.

Where there are two similar, but unrelated crimes committed against *two* unconnected victims within a short space of time, or an offense related but not "interwoven," there is not a continuous transaction and the other offense is not admissible as part of the *res gestae.*

. . . .

... The distinguishing feature seems not to be that of proximity of time or space or similarity of offense, but whether the *victims* are connected.

McColl & McCormack, Extraneous Offenses & Uncharged Conduct, at 6–23, 6–24 (1986). In support of their conclusion that the Court of Criminal Appeals is not disposed to apply the temporal proximity exception when different victims are involved, the authors cite *Cain v. State,* 642 S.W.2d 806 (Tex.Crim.App. [Panel Op.] 1982); *Bush,* 628 S.W.2d 441; *Powers v. State,* 508 S.W.2d 377 (Tex.Crim.App.1974); *Rogers v. State,* 484 S.W.2d 708 (Tex.Crim. App.1972); and *Moore v. State,* 380 S.W.2d 626 (Tex.Crim.App.1964). Appellant's sexual assault upon M.B. should have been excluded.

For the same reasons that other crimes against the fishermen should have been excluded, the trial court erred in admitting evidence that appellant and his cohorts stole fisherman Mulder's truck. The State urges that such evidence was admissible concerning "flight from the scene ... [and] efforts to locate the accused, his pursuit and capture." However, it is not clear that appellant participated in the theft of Mulder's truck. There is no eyewitness testimony. Nor is there evidence that the truck was taken *for the purpose* of flight by anyone. The only testimony is that the group left in two vehicles, the Ford Escort that apparently brought them and the Mulder truck. Inasmuch as they came in the Escort, logic says that the assailants could easily have left in the Escort except that one or more of them desired to commit theft of the truck. Thus, we have evidence that arguably had no connection to the indicted robbery except as evidence of another temporally proximate uncharged offense.

From the small bits of evidence that can be pieced together, it appears more probable that appellant departed in the Escort rather than the truck. The axe that was placed in evidence and identified by complainant as the weapon that appellant used against her was found not in the truck but in the Escort. Also, appellant's fingerprints were found in the Escort. However, I grant that the fingerprint evidence means little in this context; I have posited that he arrived at the scene of the crime in the Escort. Finally, appellant had the keys to the Escort with him in the truck at the time of the arrest, some two to three hours after the Escort was wrecked and abandoned.

According to the witnesses, the Escort and the pickup went in separate directions when they left the parking lot at White Rock Lake. When the Escort was wrecked and disabled, those who were in the Escort obviously needed alternate transportation. The best availabe surmise is that a contact was made upon the possessor of the pickup, probably by phone, and that the pickup came to the site of the wreck or some nearby rendezvous point and provided transportation for those who had been riding in the Escort. The hour was getting late and one or more of appellant's cohorts desired to go their separate ways. Inasmuch as appellant desired to continue his escapades, he dropped off those companions other than the one companion still with him at the time of the arrest. The conduct of appellant and his remaining passenger in

riding slowly down the street and shouting at a woman walking down the sidewalk attracted the attention of the police, resulting in their arrest.

Of course, the unexplained possession of recently stolen property constitutes evidence of theft, but such evidence is necessarily circumstantial. Appellant's presence at the place where the truck was stolen was not, standing alone, sufficient evidence that he stole the truck, particularly when the best indications are that one of his cohorts was, at least, the primary thief. A circumstantial evidence case cannot stand unless every reasonable hypothesis other than guilt has been excluded. The theory that someone other than appellant might have stolen the truck and turned it over to appellant after the Escort was wrecked constitutes a reasonable hypothesis other than guilt which the State has not rebutted.

Of course, this was a prosecution for the robbery from complainant A.H. of a necklace. The collateral uncharged crime of theft of Mulder's truck was inadmissible in this prosecution unless appellant's guilt of that collateral crime was clear. The evidence of theft of the truck by appellant was not possessed of such a degree of clarity that it was admissible pursuant to a claim of "res gestae to the arrest." It was therefore erroneous to admit evidence that at the time of arrest, appellant was driving a vehicle stolen from fisherman Mulder.

### HARMLESS ERROR IS INAPPLICABLE

The majority concludes that even if the admission of the extraneous offenses was error, it was harmless error. Of course, wherever harmless error is included at the foot of a ruling as a makeweight, it operates as silent concession that the primary ruling is not free from doubt. In the present case, the application of the proper harmless error analysis must irrevocably lead to the conclusion that the erroneous admission of extensive evidence of uncharged misconduct was harmful to appellant.

Our majority has omitted any meaningful harmless error analysis. It has merely declared the evidence "so overwhelming" and the facts "so egregious" that the error made no contribution to the conviction or the punishment. The Court of Criminal Appeals has recently and firmly branded this type of analysis as inadequate. *See Harris v. State*, 790 S.W.2d 568, 585 & n. 16 (Tex.Crim.App. June 28, 1989). It is insufficient to simply declare that the defendant "was guilty anyhow." Emphasis must be laid upon the error and the part that it played in the trial. If, as here, the error was pervasive, it has undermined the concept of a fair and impartial trial, constitutionally guaranteed to all offenders regardless of the heinousness of the offense or the quantum of the evidence—reversal must ensue even if "everybody knew he was guilty." *Harris* condemns the majority's approach as "incorrect because the language of the rule focuses upon the error and not the remaining evidence." *Id.* at 585; *see* Tex.R.App.P. 81(b)(2). It is, of course, impossible to gauge the significance of the error without considering the properly admitted evidence. The entire record should be reviewed, "but the concern is solely to trace the impact of the error." *Id.* at 586. Although the presence of overwhelming evidence of guilt is a factor to be considered, "[n]evertheless, in making the analysis, the predominant concern must be the error." *Id.* at 587.

In summarizing its articulation of the proper standard to be used in applying rule 81(b)(2), *Harris* states that a reviewing court should not focus upon the propriety of the trial's outcome. "Instead, an appellate court should be concerned with the integrity of the process leading to conviction." *Id.* at 587. The reviewing court should examine the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, and its probable collateral implications. The court should consider the weight that a juror would probably place upon the error. The appellate court should also determine

whether a declaration that the error was harmless would encourage the State to repeat the error with impunity. *Id.*

[T]he reviewing court should focus not on the weight of the other evidence of guilt, but rather on whether the error at issue might possibly have prejudiced the jurors' decision-making; it should ask not whether the jury reached the correct result, but rather whether the jurors were able properly to apply law to facts in order to reach a verdict. Consequently, the reviewing court must focus upon the process and not on the result. In other words, a reviewing court must always examine whether the trial was an essentially fair one. *If the error was of a magnitude that it disrupted the jurors' orderly evaluation of the evidence, no matter how overwhelming it might have been, then the conviction is tainted.*

*Id.* (emphasis added).

As already noted, the evidence of erroneously admitted uncharged offenses was voluminous. To say that this evidence was emphasized by the State would be an understatement. Fully one-half of the statement of facts was devoted to matters collateral to the taking of complainant's necklace. The crime charged in the indictment was treated as no more than an incidental happening in the midst of a criminal orgy occurring before and after the indicted offense, including crimes committed by other persons, out of the presence of the complainant, and against other victims. Likewise, the State's jury argument was full of statements about uncharged offenses. If one did not read (or listen) carefully, one might have difficulty determining, from the State's jury argument alone, which offense of the many discussed was the charged offense. Unmistakably, the improperly admitted evidence and the argument based thereon telegraphed to the jury the message: "The defendant on trial is a bad man, a criminal generally." It was highly likely that the jury's decision-making process was improperly influenced by the erroneously admitted evidence. In short, the integrity of the process leading to conviction was fatally flawed by the erroneous admission of uncharged offenses. Such a state of affairs should be neither condoned nor encouraged by a declaration that the errors were harmless. We cannot conclude beyond a reasonable doubt that the errors made no contribution to the conviction or to the punishment.

In discussing harmless-beyond-a-reasonable-doubt, two concluding observations must be made. Obviously, the harmless error rule can never be invoked to justify mob rule. No lynching may ever be excused on grounds that the evidence was "overwhelming" and the facts "egregious." Our civilized society demands a fair trial no matter how evident the guilt. Where the trial was pervasively unfair, reversal must ensue, if for no other reason than as a safeguard against pervasively unfair trials.

This dissent hesitates to castigate the trial court, or even the prosecution, too heavily, considering the state of the law concerning the admissibility of temporally proximate misconduct ("res gestae"). The fact remains that the trial was literally saturated with improperly admitted collateral misconduct evidence. It was so pervasive that it was bound to have impressed the jury, to have interfered with its deliberations, and to have distracted it from the actus reus charged in the indictment. If we invoke harmless error to cure error such as this, we move in the direction of the standards observed by the mob in the street.

Finally, it must be noted that harmless error is a double-faceted proposition. Wherever the error is truly harmless to the defendant, it is also harmless to the State if we incline our necessarily subjective evaluation in favor of the defendant and order a new trial. Where the evidence is truly "overwhelming" and the facts truly "egregious," the defendant will inevitably be reconvicted, again and again and again.

Of course, there are many who would take exception to the statement just made,

**942**

and who would point out the burden of time and expense involved in a retrial. Suffice to say, that burden upon the community is mild compared to the burden cast upon a defendant committed to prison for a large part of his adult life without ever receiving a fair and impartial trial. Harmless error will not rescue this case from the defects shown by this record.

Before commitment to prison for a period of sixty years, appellant was entitled to "at least one tolerably fair trial." *Shawhan v. Commonwealth,* 318 S.W.2d 541, 544 (Ky. 1958). Because of the introduction into his trial of evidence of numerous temporally proximate, but in no wise intrinsic, uncharged offenses, none of which was offered as independent evidence in support of some specific element of the crime on trial, this appellant has not received that one "tolerably fair trial." *See id.* For such reason, I dissent. This conviction must be reversed and the cause remanded for new trial.