

## NUMBER 13-10-00201-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

MARK VALENCIA, Appellant,

v.

THE STATE OF TEXAS, Appellee.

### On appeal from the 94th District Court of Nueces County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Benavides
Memorandum Opinion by Chief Justice Valdez**

Appellant, Mark Valencia, was charged by indictment with one count of aggravated assault ("Count 1"), a second-degree felony, *see* TEX. PENAL CODE ANN. § 22.02(a), (b) (West Supp. 2010); one count of unlawful possession of a firearm by a

felon ("Count 2"), a third-degree felony, *see id.* § 46.04(a), (e) (West Supp. 2010); one count of unlawful carrying of a weapon ("Count 3"), a third-degree felony, *see id.* § 46.02(a), (c) (West Supp. 2010); and one count of evading arrest ("Count 4"), a state-jail felony. *See id.* § 38.04(a), (b)(1)(A) (West Supp. 2010).[1] After the jury found him guilty of the charged offenses, Valencia was sentenced to: (1) forty years' incarceration in the Institutional Division of the Texas Department of Criminal Justice for Count 1; (2) thirty years' incarceration for Counts 2 and 3; and (3) ten years' incarceration for Count 4.[2] The sentences were ordered to run concurrently. By five issues, Valencia argues that: (1) the trial court erred in allowing evidence of a photographic line-up because the lineup was "impermissibly suggestive and constituted bolstering"; (2) the trial court erred in charging the jury that he could be found guilty of felony evading arrest under section 38.04; and (3) the evidence supporting specific elements of Counts 2, 3, and 4 is insufficient. We affirm.

## I.    BACKGROUND

During the early morning hours on September 4, 2009, Valencia drank beer and watched exotic dancers with his friend, Rogelio Vasquez, at the Party Place Cabaret

---

[1] The indictment further alleged that Valencia had been previously convicted of evading arrest on June 7, 2004, which enhanced the evading arrest count to a state-jail felony. *See* TEX. PENAL CODE ANN. § 38.04(b)(1)(A) (West Supp. 2010). In addition, each of the allegations made in the indictment were further enhanced by Valencia's prior convictions for: (1) first-degree felony murder on January 8, 1988; and (2) unlawful possession of cocaine, a second-degree felony, on September 9, 1997. Thus, the enhanced punishment range for Counts 1-3 was "life, or for any term not more than 99 years or less than 25 years," and Count 4 was enhanced to a second-degree felony with a punishment range of two to twenty years. *See id.* §§ 12.33(a), 12.42(a)(2), (d) (West Supp. 2010).

[2] A deadly weapon finding as to Count 1 was also made.

(the "Cabaret") in Corpus Christi, Texas.  The Cabaret usually closed at 2:00 a.m.  At 1:45 a.m., Michael Soto, the Cabaret's night manager, bouncer, and DJ, announced that "it [was] last call for alcohol."  The Cabaret stopped selling alcohol at 1:50 a.m.  At the time of the announcement, approximately ten to twelve customers remained in the Cabaret, including Valencia and Vasquez.

Shortly thereafter, Soto observed Valencia trying to put a twelve-ounce bottle of beer in the pocket of his jeans.  Soto testified that he "got on the microphone and I announce, you know, Sir, you know . . . you cannot take the beer, so you might as well drink it and take it out of your pocket."  Soto testified that "[i]t's illegal for you to take the beer out of the bars."  Valencia responded by approaching Soto, who was behind the DJ booth.  Soto recalled the incident as follows:

> He [Valencia] took the beer out of his pocket and placed it on the table and asked me if the beer was that fucking important.
>
> . . . .
>
> I told him, sir, it was just a beer, a $3.50 beer.  You know, either drink it, throw it away, and it's time to go.  I went for the beer and he moved it with his left hand[;] he moved it.  I told him, sir, it's just a beer, it's not that important.  I'm trying to close, you know, let's just go ahead and go.  And he kept asking me again, is the beer that fucking important.  I told him it's just a beer and I went for the beer again, then it was already the second time he was gonna [sic] give it up, he moved it again for a third time.  He asked me one more time, "Is the beer that fucking important."  That's when I raised my hands up and I said, "It's just a beer," and that's when he pulled the gun out and aimed it right to my chest.

Soto identified the firearm as either a .40-caliber or nine-millimeter Smith & Wesson handgun. Soto further testified that the gun was gray with a black bottom and that he recognized the make and model of the gun because he owns a similar gun.

With the gun still pointed at him, Soto then "made relations" with Valencia and "tried [his] best to talk [his] way out of it."[3] Valencia and Vasquez then left the Cabaret through the front door. As he left, Valencia kept the gun pointed in Soto's direction. After Valencia exited the Cabaret, Soto instructed the remaining customers and Cabaret employees to go to the dressing rooms, which were towards the back of the Cabaret, in case Valencia returned. Soto then went to the front door of the Cabaret and peered out. Soto recalled that a police officer had been parked in a lot adjacent to the Cabaret's parking lot when he went outside to smoke a cigarette about twenty minutes earlier. When he peered out of the front door, Soto saw Valencia and Vasquez heading towards a pick-up truck. Soto also saw the police car still parked in the adjacent lot. Valencia saw Soto peer out the door and once again pointed the gun in Soto's direction. Soto retreated into the Cabaret, and when he peered out the door a few seconds later, he saw the pick-up truck leave the Cabaret's parking lot.

As the pick-up truck left the Cabaret's parking lot, Soto flagged the police officer parked nearby and informed him about the incident. After speaking with Soto, the police officer, Lieutenant Tim Brown of the Corpus Christi Police Department, began to

---

[3] Soto's girlfriend, Estella Martinez, the Cabaret's door girl, corroborated Soto's testimony about Valencia's brandishing of a gun in the Cabaret.

pursue the pick-up truck with his emergency lights activated. Lieutenant Brown followed the pick-up along Leopard Street until the driver of the pick-up made a sharp turn and headed towards the entrance ramp to southbound Interstate 37. At no point did Lieutenant Brown observe anything being thrown from the pick-up truck. Lieutenant Brown called for backup and continued to follow the pick-up truck onto Interstate 37 and then on several side streets until they reached a residential area. During the pursuit, Lieutenant Brown witnessed the pick-up truck run "red lights at Agnes and Airport while it was traveling on Old Robstown Road." Officers Norman Morton and Jose Flores responded to Lieutenant Brown's call for backup and proceeded to run "parallel" so that they could "join the pursuit." Eventually, the three police cars followed the pick-up truck into a residential area. At one point, the pick-up truck slowed down, and the passenger, Valencia, jumped out and ran on foot. Officers Morton and Flores stopped their vehicles and pursued Valencia on foot. Lieutenant Brown continued to follow the pick-up truck.

With respect to the pursuit of Valencia on foot, Officer Morton described the scene as follows:

> The passenger came out of the car and ran up the street because it was kind of curbs, I think it's Gloria or something, I'm not sure of the name of the street, and [sic] it goes up. We chased him probably about 50 yards[,] and while he was running[,] he's messing with his pants, kind of pulling his pants up.
>
> Because the call was that the subject was supposed to have a gun, I backed off him a little bit, drew my Taser deployed the Taser, got him in the back[,] and he fell to the ground.[4]

---

[4] Officer Morton further testified that before deploying his taser, he shouted "Stop, Police" to Valencia, but Valencia continued to run from them.

5

After Valencia fell to the ground, Officers Morton and Flores arrested Valencia, but they did not observe a gun on Valencia's person.[5] They did, however, notice that Valencia was wearing blue jeans and had a laceration on the bottom of his chin as a result of the pursuit and subsequent tasing. Police escorted Valencia to the local hospital so that the laceration could be bandaged.

Officer Cortney Daggett testified that he attempted to join in the pursuit of the pick-up truck to set up "spike stripes"; however, in attempting to "parallel the pursuit," Officer Daggett was unable to continue following. Instead, he traveled to the Cabaret to interview witnesses. Officer Daggett testified that Soto "was shaken up, he was visibly shaken."

According to Lieutenant Brown, after Valencia received treatment for the laceration on his chin, Officer Morton took Valencia back to the Cabaret for identification by Soto. Soto identified Valencia as the perpetrator, and Valencia was subsequently taken to the police station. A couple of weeks later Soto was asked to come to the police station to identify the gun and the perpetrator from a photographic line-up. After reviewing the subjects in the photographic line-up, Soto identified Valencia as the perpetrator. Police also asked Estella, Soto's girlfriend, to identify the perpetrator from a photographic line-up. She also identified Valencia as the perpetrator. At trial, Valencia objected to the line-up as "impermissibly suggestive" because the only subject

---

[5] Officers testified that the pursuit lasted approximately ten minutes.

in the line-up in a white T-shirt was Valencia; because he was the only person with a scrape on his chin; and because Valencia had a "unique complexion out of every—all the other individuals."[6]

After reviewing the offense report he created, Officer Daggett stated that once he had spoken with Soto, he "backtracked where the pursuit had gone and I was looking at ditches and the grass and median and I ended up finding a bunch of ammunition and a pistol magazine." Officer Daggett noted that he found a .40-caliber Smith & Wesson handgun, which matched the handgun described by Soto, with twelve "live .40[-]caliber rounds" on the "37 access road eastbound, just east of Navigation. Just a little past the Denny's on 37." Officer Daggett acknowledged, however, that he never observed the handgun in Valencia's possession. On re-direct examination, Officer Daggett admitted that he incorrectly recalled the time his discovered the handgun and, instead, asserted that the handgun was discovered a day after the incident occurred.

Antonio Aguilar, an officer with the Corpus Christi Police Department, testified that he was dispatched to recover a .40-caliber Smith & Wesson handgun and twelve unfired rounds that had been found by Mauricio Moreno, a warehouse manager for Contractors Building Supply, who happened to discover the items while he was mowing the grass. Moreno testified that the items were "right at the edge of the grass and the driveway going into the—our corporate office right there." Moreno denied touching the handgun or unfired rounds and stated that upon discovering the items, he immediately

---

[6] The record indicates that all of the subjects in the photographic line-up had a black bar placed over their chins so as to obscure the fact that Valencia had a scrape on his chin.

called the police. Officer Aguilar confirmed that the handgun and unfired rounds were found at "5125 IH-37 access, southbound," which was near a Denny's. On cross-examination, Officer Aguilar admitted that several motels and establishments where criminals frequented were located near where the handgun and unfired rounds were found, and he acknowledged that the items that were found could have been discarded by someone else.

Carolyn Martinez, an expert in firearms and tool-marks employed by the Corpus Christi Police Department, noted that she conducted fingerprint and ballistics tests on the found handgun and unfired rounds. After conducting various tests on the items, Martinez admitted that "nothing very tangible was obtained as a result of [her] examination" and that she "didn't get any development of prints" to conclusively link Valencia to the handgun and unfired rounds. A review of records reported by gun dealers revealed that the gun was sold to Josh Goforth of Corpus Christi; however, Martinez did not report this information to investigators because it was never requested. The records did reveal, however, that the gun had been purchased by Goforth approximately 181 days before it was discovered; Martinez acknowledged that "a lot of things can happen in six months with a gun."

The State rested its case-in-chief, and Valencia subsequently moved for a directed verdict as to Count 4, the charge of evading arrest, which the trial court denied. As a part of his case-in-chief, Valencia called one witness—his sister, Esperanza Valencia. Esperanza testified that during the late evening hours of September 3, 2009,

and the early morning hours of September 4, 2009, she was at her mother's house. Esperanza noted that Valencia lived at his mother's house and that he left the house at approximately 11:30 p.m. on September 3, 2009 to go out. Esperanza recalled that when he left, Valencia was wearing "[a] little tank top with blue jeans, or a T-shirt. I don't know what they're called, the little muscle shirts." She also recalled seeing Valencia get into a pick-up, though she could not recall the model or color of the pick-up truck.

At the conclusion of the evidence, the jury convicted Valencia on all four counts and sentenced him to: (1) forty years' confinement for Count 1; (2) thirty years' confinement for Counts 2 and 3; and (3) ten years' confinement for Count 4. The sentences were ordered to run concurrently. The trial court certified Valencia's right to appeal, and this appeal followed.

## II. THE PHOTOGRAPHIC LINE-UP

By his first issue, Valencia contends that the trial court committed reversible error by allowing evidence of Soto's pre-trial identification of Valencia by photographs because the photographic line-up was impermissibly suggestive and constituted bolstering.

### A. Applicable Law

In-court identification is inadmissible if tainted by an unduly suggestive pre-trial identification. *See Loserth v. State*, 963 S.W.2d 770, 771 (Tex. Crim. App. 1998). In determining whether the trial court erred in admitting an in-court identification, we

9

employ a two-step analysis, inquiring:  (1) if the pre-trial procedure was impermissibly suggestive; and (2) if so, whether the impermissibly suggestive pre-trial procedure gave rise to a very substantial likelihood of irreparable misidentification at trial.  *See Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999); *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993); *see also Livingston v. State*, 739 S.W.2d 311, 334 (Tex. Crim. App. 1987) ("[I]f the line[-]up occurred after initiation of formal adversarial proceedings or where the confrontation was found to be 'so unnecessarily suggestive and conclusive to irreparable mistaken identification' that it would deny an accused due process of law, an in-court identification would not be allowed unless it was shown that the identification had an origin independent of the challenged confrontation, as viewed by the totality of circumstances.").  It is the risk of in-court misidentification that taints the identification. *See Webb v. State*, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988).  The defendant has the burden to show by clear and convincing evidence that the in-court identification is unreliable.  *See Delk*, 855 S.W.2d at 706.  The admissibility of an identification is a mixed question of law and fact that we review de novo.  *See Loserth*, 963 S.W.2d at 773.

In the first step, we evaluate the pre-trial photo line-up itself to determine whether it was impermissibly or unduly suggesting.  "A line[-]up is considered unduly suggestive if other participants are greatly dissimilar in appearance from the suspect."  *Withers v. State*, 902 S.W.2d 122, 125 (Tex. App.–Houston [1st Dist.] 1995, pet. ref'd) (citing *United States v. Wade*, 388 U.S. 218, 232-33 (1967)).  A suspect may be greatly

10

dissimilar in appearance from the other participants because of his distinctly different appearance, race, hair color, height, or age. *See id.* (citing *Foster v. California*, 394 U.S. 440, 442-43 (1969)). But minor discrepancies between line-up participants do not render a line-up impermissibly suggestive. *See id.* (citing *Partin v. State*, 635 S.W.2d 923, 926 (Tex. App.–Fort Worth 1982, pet. ref'd)). The line-up participants need not be identical to satisfy due process requirements. *See Buxton v. State*, 699 S.W.2d 212, 216 (Tex. Crim. App. 1985).

## B. Discussion

Assuming, without deciding, that the pre-trial identification done via a photographic line-up was impermissibly suggestive, we conclude that Valencia has failed to prove by clear and convincing evidence that the alleged impermissibly suggestive pre-trial procedure gave rise to a very substantial likelihood of irreparable misidentification at trial.[7] *See Ibarra*, 11 S.W.3d at 195; *Delk*, 855 S.W.2d at 706; *McClenton v. State*, 167 S.W.3d 86, 96-97 (Tex. App.–Waco 2005, no pet.); *see also Jackson v. State*, 657 S.W.2d 123, 130 (Tex. Crim. App. 1983) (holding that if the totality of the circumstances reveals no substantial likelihood of misidentification, an out-

---

[7] In *Jackson v. State*, the court of criminal appeals noted that:

> A defendant who contends on appeal that a trial court erred in allowing an in[-]court identification of him by a complaining witness has a difficult and heavy burden to sustain, for unless it is shown by clear and convincing evidence that a complaining witness' in[-]court identification of a defendant as the assailant was tainted by improper pre-trial identification procedures and confrontations, the in[-]court identification is always admissible.

628 S.W.2d 446, 448 (Tex. Crim. App. 1982).

11

of-court identification will be deemed reliable regardless of a suggestive pre-trial procedure); *Garza v. State*, 633 S.W.2d 508, 512 (Tex. Crim. App. 1982) (op. on reh'g) (concluding that the fact that the show-up procedure was an on-the-scene confrontation conducted shortly after the crime occurred did not violate defendant's due process rights; thus, the identification was admissible). At trial, evidence was adduced that after Valencia received treatment for the laceration on his chin, Officer Morton took Valencia back to the Cabaret and Soto identified Valencia as the perpetrator at that time. *See Livingston*, 739 S.W.2d at 334; *see also Jackson*, 657 S.W.2d at 130 (concluding that if the record clearly reveals that the witness's prior observation of the accused was sufficient to serve as an independent origin for the in-court identification, then in-court testimony of an identification witness is admissible, even where the pre-trial identification procedure was impermissibly suggestive). In addition, several witnesses, including Soto, Estella, and police officers, separately identified Valencia as the man who pulled a gun on Soto at the Cabaret and subsequently fled the scene, both in court and out of court. Thus, the complained-of evidence was cumulative of other evidence pertaining to the identification of Valencia as the perpetrator, including evidence regarding the pre-trial photographic line-up, and the admission of such evidence was harmless. *See Livingston*, 739 S.W.2d at 334; *see also Matz v. State*, 21 S.W.3d 911, 912 (Tex. Crim. App. 2000) (stating that if other properly-admitted evidence proves the same facts, any error is harmless); *Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (same). Based on this evidence, we cannot say that Valencia proved by

12

clear and convincing evidence that there was a substantial likelihood that witnesses misidentified Valencia as the perpetrator at trial based upon an alleged impermissibly suggestive pre-trial photographic line-up.

In addition, Valencia asserts that the admission of evidence pertaining to Soto and Estella's pre-trial identification of Valencia through photographic line-ups constituted improper bolstering. We first note that Valencia has not adequately explained on appeal how the admission of such evidence amounted to improper bolstering. *See* TEX. R. APP. P. 38.1(i). In any event, we note that "bolstering" is no longer a valid objection where testimony is not deemed to be hearsay. *See Jones v. State*, 833 S.W.2d 634, 635 (Tex. App.–Houston [14th Dist.] 1992, pet. ref'd); *see also White v. State*, No. 01-98-00148-CR, 1999 Tex. App. LEXIS 5072, at *6 (Tex. App.–Houston [1st Dist.] July 8, 1999, no pet.) (mem. op., not designated for publication). Texas Rule of Evidence 801(e)(1)(c) provides that a statement is not hearsay if the declarant testifies at trial, is subject to cross-examination, and the statement is one of identification of a person made after perceiving him. TEX. R. EVID. 801(e)(1)(c); *see Jones*, 833 S.W.2d at 635; *see also White*, 1999 Tex. App. LEXIS 5072, at *6. Here, both Soto and Estella testified at trial and were subject to cross-examination. In addition, the complained-of evidence pertains to Soto and Estella's identification of Valencia as the perpetrator after perceiving him. Thus, we reject Valencia's bolstering argument. Accordingly, we overrule Valencia's first issue.

### III. EVADING ARREST

In his second issue, Valencia argues that the trial court erred in charging the jury that he could be found guilty of felony evading arrest under section 38.04 of the penal code. *See* TEX. PENAL CODE ANN. § 38.04. He also challenges the sufficiency of the evidence demonstrating that he evaded arrest.[8]

The Texas Court of Criminal Appeals has held that our only sufficiency review should be under "a rigorous and proper application" of the *Jackson* standard of review. *Brooks v. State*, 323 S.W.3d 893, 906 (Tex. Crim. App. 2010). Under this standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks*, 323 S.W.3d at 902 n.19. "[T]he fact-finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319 (emphasis in original); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979) (The jury, in all cases, is the exclusive judge of facts proved and the weight to be given to the testimony . . . ."); *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) ("The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence.").

---

[8] Count 4 of the indictment originally alleged that Valencia had evaded Lieutenant Brown "while using a vehicle"; however, the indictment was amended on March 1, 2010, to omit that language.

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009). "'Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

Section 38.04(a) provides that an individual commits the offense of evading arrest "if he intentionally flees from a person he knows is a peace officer attempting to lawfully arrest or detain him."[9] TEX. PENAL CODE ANN. § 38.04(a). With regard to punishment, section 38.04(b)(1) states that the offense of evading arrest is a class A misdemeanor, unless the actor "has been previously convicted under this section" or the actor "uses a vehicle while the actor is in flight and the actor has not been previously convicted under this section," in which case the offense becomes a state-jail felony. *Id.* § 38.04(b).

_____

[9] "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2003). Intent may "be inferred from circumstantial evidence[,] such as acts, words, and the conduct of the appellant." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *see Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (stating that a fact-finder may infer both knowledge and intent from the defendant's acts, words, or conduct and from the nature of the wounds inflicted on the victim); *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991); *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984) (noting that the requisite culpable mental state may be inferred from the surrounding circumstances).

15

The State tendered a copy of the judgment indicating that on June 7, 2004, Valencia had been previously convicted of evading arrest under section 38.04 of the penal code.[10]  Pursuant to section 38.04(b)(1), Valencia's conviction for evading arrest in this case would constitute a state-jail felony because of his prior conviction for evading arrest.[11]  *Id.*  Thus, it does not matter whether the evidence established that Valencia evaded arrest "while using a vehicle."

Officer Morton testified that on the night in question, Valencia exited a moving vehicle and ran from police.  Officer Morton instructed Valencia to "Stop, Police"; however, Valencia continued to run until Officer Morton deployed his taser.  Reviewing the evidence in the light most favourable to the prosecution, we conclude that a rational juror could have concluded that Valencia evaded arrest under section 38.04 for a second time; thus, we hold that the evidence is sufficient to support Valencia's conviction for felony evading arrest.  *See id.*; *see also Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 906.  Accordingly, we overrule Valencia's second issue.

### IV.    PROOF THAT VALENCIA FLED FROM LIEUTENANT BROWN

By his third issue, Valencia asserts that the record contains no evidence that he fled from Lieutenant Brown on the night in question, as was alleged in the indictment,

---

[10] The record also contains a second judgment indicating that Valencia was convicted of another instance of evading arrest on July 22, 2004.

[11] The evading arrest count was further enhanced to a second-degree felony by evidence of Valencia's prior felony convictions for murder and unlawful possession of cocaine.  *See* TEX. PENAL CODE ANN. § 12.42(a)(2).

because he was merely a passenger in the truck driven by Vasquez.[12]  In making this argument, Valencia devotes two small paragraphs of his brief to the issue, and he does not cite to any authority to support his contention.  As such, we conclude that this issue was inadequately briefed.  *See* TEX. R. APP. P. 38.1(i).

Nevertheless, even if this issue had been adequately briefed, we disagree with Valencia's contention.  The record reflects that Valencia left the Cabaret while pointing a gun at Soto.  Valencia then got into a pick-up truck driven by Vasquez.  The passengers in the pick-up truck proceeded to lead police on a ten-minute pursuit around Corpus Christi.  Lieutenant Brown first pursued the pick-up truck as it left the Cabaret's parking lot.  Further, the emergency lights on Lieutenant Brown's patrol car were activated during the pursuit so as to notify the occupants of the pick-up truck to stop.  The evidence demonstrates that Valencia used the pick-up truck driven by Vasquez to flee police, a conclusion that is supported by the fact that once he exited the truck, Valencia continued to run away from police.  *See* TEX. PENAL CODE ANN. § 38.04(b)(1)(B) (providing that an actor need only *use* a vehicle to evade arrest, rather than be the driver of the vehicle); *see also Jones v. State*, No. 05-09-00114-CR, 2010 Tex. App. LEXIS 157, at **1-6 (Tex. App.–Dallas Jan. 12, 2010, no pet.) (mem. op., not designated for publication) (affirming appellant's conviction for evading arrest, even though appellant was not the driver of the vehicle that fled from law enforcement);

---

[12] Count 4 of the indictment specifically provides that Valencia "on or about SEPTEMBER 4, 2009 . . . did then and there intentionally flee from Tim Brown, a person the defendant knew was a peace officer who was attempting lawfully to arrest or detain the defendant . . . ."

17

*Marron v. State*, No. 01-02-00601-CR, 2003 Tex. App. LEXIS 3581, at **9-11 (Tex. App.–Houston [1st Dist.] Apr. 24, 2003, no pet.) (mem. op., not designated for publication) (same).[13] We overrule Valencia's third issue.

## V. UNLAWFUL POSSESSION OF A FIREARM BY A FELON

In his fourth issue, Valencia contends that the evidence supporting his conviction for unlawful possession of a firearm by a felon is insufficient. Specifically, Valencia argues that there is no evidence indicating that he "was convicted of an offense within five years of the date of the charged offense." In his brief, Valencia does not provide any citations to the record, nor does he cite any authority supporting his contentions. As a result, we conclude that this issue has been inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

## VI. UNLAWFUL CARRYING OF A WEAPON

By his fifth issue, Valencia contends that there is no evidence that he carried a firearm on a licensed premise. *See* TEX. PENAL CODE ANN. § 46.02(a). Specifically, he

---

[13] In *Marron*, the First Court of Appeals, in concluding that the evidence supporting appellant's conviction for evading arrest was sufficient, noted the following facts, which are strikingly similar to the facts in this case:

> The record shows that the car in which appellant was riding was being pursued by two patrol cars with activated lights and sirens at the time that appellant allegedly attempted to evade arrest. While being pursued, the driver fled the moving car. As soon as it was safe to do so, appellant also jumped out of the car and was attempting to get up when he was seized by Deputy Brown. After appellant jumped out of the car, but before he was seized, he was facing the opposite direction from the deputies and ignored their commands to stay down on the ground.

*Marron v. State*, No. 01-02-00601-CR, 2003 Tex. App. LEXIS 3581, at *10 (Tex. App.–Houston [1st Dist.] Apr. 24, 2003, no pet.) (mem. op., not designated for publication).

argues that "there was no admissible evidence that the bar was licensed." We disagree.

The penal code provides that a person commits the offense of unlawfully carrying a weapon if:

> the person intentionally, knowingly, or recklessly carries on or about his or her person a handgun, illegal knife, or club if the person is not:
>
> > (1) on the person's own premises or premises under the person's control; or
> >
> > (2) inside of or directly en route to a motor vehicle that is owned by the person or under the person's control.

*Id.*

Here, the State tendered a copy of the Cabaret's liquor license purportedly issued by the Texas Alcoholic Beverage Commission (the "TABC"), which was designated as State's exhibit 27. Relying on Texas Rule of Evidence 902, Valencia asserts that the license "was not properly authenticated or admitted." *See* TEX. R. EVID. 902 (listing types of documents that can be self-authenticating). He further notes that the purported liquor license is void, has no seal, and "is not attested to by any official or agent of the [T]ABC certifying that fact."

Several witnesses testified that the Cabaret was licensed by the TABC to sell liquor. Moreover, the license itself contains a signature of an "Administrator" for the TABC. The copy of the licensed tendered by the State does contain imprints of the word "VOID" in various places on the license; however, this notation likely exists

because the exhibit is a copy of the actual license. The "VOID" notation is designed to prevent unauthorized replication of the license. Because several witnesses testified that the Cabaret was licensed by the TABC at the time of the incident, we need not reach Valencia's arguments pertaining to the validity of State's exhibit 27. This is so because State's exhibit 27 is cumulative of other evidence in the record. *See Matz*, 21 S.W.3d at 912; *Brooks*, 990 S.W.2d at 287. Therefore, any error associated with the admission of the purported liquor license is harmless. *See Matz*, 21 S.W.3d at 912; *Brooks*, 990 S.W.2d at 287.

In any event, we also note that, in applying the *Jackson* standard of review, an appellate court considers all the evidence admitted before the jury, including which was admitted properly and that which may have been admitted improperly. *See Moff v. State*, 131 S.W.3d 485, 488 (Tex. Crim. App. 2004); *see also Thomas v. State*, 753 S.W.2d 688, 695 (Tex. Crim. App. 1988). The court of criminal appeals has stated that:

> We first note that in reviewing the sufficiency of the evidence, the appellate court must look at all the evidence, whether properly or improperly admitted. In the event a portion of the evidence was erroneously admitted, the accused may complain on appeal of such error. The admission of inadmissible evidence is considered trial error and thus the proper remedy is to reverse the conviction and remand for a new trial. But jurors do not act irrationally in taking such evidence into account, since they are bound to receive the law from the trial judge. All evidence which the trial judge has ruled admissible may therefore be weighed and considered by the jury, and a reviewing court is obligated to assess the jury's factual findings from this perspective.

*Miles v. State*, 918 S.W.2d 511, 513 (Tex. Crim. App. 1996) (internal quotations & citations omitted); *see* GEORGE E. DIX & ROBERT O. DAWSON, 43A TEXAS PRACTICE,

CRIMINAL PRACTICE AND PROCEDURE § 43.531, at 742 (2d ed. 2001) ("[A]n appellant . . . is not entitled to have an appellate court first consider the appellant's complaints concerning improper admitted evidence and, if it resolves any of those in favor of the appellant, to then, second, consider the sufficiency of the *properly-admitted* evidence to support the conviction.") (emphasis in original). The impetus behind this rule is "the unfairness of barring further prosecution where the State has not had a fair opportunity to prove guilt. A trial judge's commission of trial error may lull the State into a false sense of security that may cause it to limit its presentation of evidence." *Moff*, 131 S.W.3d at 490.

As noted earlier, several witnesses testified that the Cabaret is licensed to sell alcoholic beverages in the State of Texas. Moreover, aside from his authentication contention regarding State's exhibit 27, Valencia does not argue that a rational juror could not accept the witnesses' testimony or State's exhibit 27 as proof beyond a reasonable doubt that the Cabaret is a licensed premises. Thus, we conclude that the evidence supporting that element of the State's case is sufficient, and we overrule Valencia's fifth issue. *See* TEX. PENAL CODE ANN. § 46.02(a); *see also Romero v. State*, No. 07-06-0198-CR, 2008 Tex. App. LEXIS 4221, at **10-13 (Tex. App.–Amarillo June 11, 2008, no pet.) (mem. op., not designated for publication) (concluding that the testimony of a police officer regarding whether a bar is licensed was sufficient to support the jury's finding that the bar is a licensed premises).

### VII.    CONCLUSION

Having overruled all of Valencia's issues, we affirm the judgment of the trial court.

_____
ROGELIO VALDEZ
Chief Justice

Do not Publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
19th day of May, 2011.

22