Henry JACKSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 958–82.

Court of Criminal Appeals of Texas,
En Banc.

Sept. 21, 1983.

William Morrow, John L. Carrington, Brownsville, for appellant.

Selden N. Snedeker, Dist. Atty. and Randell W. Friebele, Asst. Dist. Atty., Brownsville, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

ONION, Presiding Judge.

Appeal is taken from a conviction for theft of a motorcycle valued at more than $200.00 but less than $10,000.00. Punishment was assessed by the jury at five (5) years' imprisonment.

On appeal the conviction was reversed in a published opinion by a panel of the Corpus Christi Court of Appeals with Justice Raul Gonzales dissenting. *Jackson v. State,* 653 S.W.2d 842 (Tex.App.1982). The Court of Appeals held that the in-court identification of appellant by Mrs. Besteiro and her granddaughter was tainted by the out-of-court identification procedures and not shown to be based on independent observations at the time of the alleged offense. The State in its petition for discretionary review contends the majority of the panel

was in error. We agree and reverse the Court of Appeals.

It was the State's theory that the appellant, a black man, went to the home of Mrs. Dolores Besteiro and requested to test ride the motorcycle her grandson had for sale; that he took the motorcycle and did not return.

Appellant filed a motion to suppress the identification testimony of Mrs. Besteiro and her granddaughter, Joana, contending such witnesses had identified him at a pretrial police station confrontation under identification procedures which were unduly prejudicial, unfair and in violation of due process, and that such out-of-court identification should be suppressed as well as any in-court identification tainted thereby. The motion called into question the admissibility of both the out-of-court and in-court identifications.

After a hearing on the motion to suppress, the court overruled the same.[1] At trial the said witnesses made their in-court identification and this was bolstered by testimony of the out-of-court identification elicited by the prosecution.

The reversal by the Court of Appeals was based on appellant's first ground of error, which contends the "trial court erred in overruling appellant's motion to suppress and admitting into evidence the in-court identification of appellant by the witnesses Dolores and Joana Besteiro because it was tainted by an improperly conducted one man show up which was inherently suggestive. Said viewing denied appellant due process of law because it was inherently, unnecessarily and overly suggestive and conducive to irreparable mistaken identification."

Appellant's claim of due process violation is independent of the exclusionary rules announced in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967),

1. The trial court made no findings of facts and conclusions of law as recommended in *Martinez v. State,* 437 S.W.2d 842 (Tex.Cr.App. 1969), which would have been helpful to the appellate courts. The failure, however, to

make written findings of facts is not reversible error. *Garcia v. State,* 563 S.W.2d 925 (Tex.Cr. App.1978); *Schneider v. State,* 645 S.W.2d 463, 466 (Tex.Cr.App.1983). See also *Burton v. State,* 636 S.W.2d 802 (Tex.App. El Paso 1982).

and *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), which were fashioned to deter law enforcement authorities from exhibiting an accused to witnesses prior to trial for identification purposes without notice and in the absence of counsel absent an intelligent waiver by the accused. See *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Graham v. State,* 422 S.W.2d 922 (Tex.Cr. App.1968).

Since the facts are important in assaying appellant's contention, we shall examine the same in some detail.

At the pre-trial hearing on the motion to suppress Dolores Besteiro, 80 years of age, testified that after reporting the motorcycle being stolen on March 16, 1979, the police called her a few days later and told her they wanted to see her. She was not told why they wanted to see her. A police officer brought her to the station. She testified, "I had figured out they were going to ask me if I could recognize the motorcycle but, when I arrived, they opened up the door and I saw the man . . ." She related she recognized the black man as the man who took the motorcycle. She identified the appellant as that man and as the man who was at the station.

On cross-examination by appellant Mrs. Besteiro related that when she entered the police office there was one police officer and one Negro man; that she had not seen a Negro from the date of the theft until the time of the police station confrontation; that she was not asked to view other black people; that she was not shown a photographic display. She also testified that two weeks before the suppression hearing she saw the appellant in the courtroom at the time of an earlier setting of the case.

Joana Besteiro, 13 year old granddaughter of Mrs. Besteiro, testified that a Brownsville policeman came to the house on March 16th when the theft of a motorcycle was reported. She described to the policeman the man who had taken the motorcycle as "Tall, slender, black, a short Afro, black pants and white shirt." She saw the man later at the police station where the police had taken her and her grandmother. She did not know why they were taken to the station. Upon arriving, they were taken to a room in which a black man was sitting down, and her grandmother told the police that was the man. She stated the police did not say the man was the suspect or ask her to identify the black man. She then identified the appellant as that man and as the man who took the motorcycle. Appellant did not interrogate. In response to the court's question, Joana testified the man who took the motorcycle was in her presence and her grandmother's presence for about an hour in a garage, and she was three or four feet from the man during the hour.

Brownsville Police Sgt. Patricio Ochoa testified that on March 19, 1979, as he was leaving work shortly after 5 p.m. Mrs. Besteiro and her granddaughter arrived. Since he had called the Besteiros earlier, he met them in the parking lot and walked back to the station with them. As he opened the door to an office and they walked in, Mrs. Besteiro stated, "That is the man that took the motorcycle." He denied he pointed out the appellant or prompted Mrs. Besteiro. On cross-examination Ochoa stated only Police Lt. Sauceda (a non-black) and the appellant were in the room when they entered the office. While he had earlier denied it, Ochoa acknowledged that when he called Mrs. Besteiro to come to the police station he told her the police had a suspect, but did not mention the suspect was black. He stated that there had not been a lineup and that pictures were not shown to the Besteiros. On redirect examination Sgt. Ochoa stated he could not, in Brownsville on March 19, have gotten a lineup of six black men of the same physical build, height, physical attributes, etc., as the appellant. He stated that black people were scarce in the area.

Pat Tamayo, police employee, testified on March 19, 1979 he was in his office adjacent to the Sgt.'s office and heard a female voice saying, "That is him; that's the one that stole the motorcycle." He went next door and saw Mrs. Besteiro and Joana and heard

Mrs. Besteiro repeat the above remark. He did not hear any prompting.

After the suppression motion was overruled and at the trial on the merits, Dolores T. Besteiro testified that on the afternoon of March 16, 1979, about 5 p.m., a black male arrived at her home in Brownsville and inquired about a motorcycle that her grandson had offered for sale. She and her granddaughter, Joana Besteiro, talked to the black male for more than an hour. He told her his family was from New Jersey, had gone to California, his mother now lived in Dallas, and that he had two children. After they had talked awhile, the black male showed her a Texas Driver's license. He asked about a hamburger stand and was told there were several in the neighborhood. He asked permission to use the motorcycle to go to one of the stands. He left an identification card when Mrs. Besteiro granted permission. The black male did not return and neither did the motorcycle. She described the black male as wearing a plain tee shirt and dark trousers. She made a positive in-court identification of the appellant as the black male who took the motorcycle. She also testified on direct examination she had seen him later at the police station.

Joana Besteiro testified she was at her grandmother's home on March 16, 1979 when the appellant came to the house about 5 p.m. She described him as being dressed in a white long-sleeved shirt and black pants; that she had talked to him about an hour; that he talked about his children and "sort of" talked about where he was from. She recalled he asked if he could "try out" the motorcycle around the block and see if he liked it, and that he took the motorcycle and did not return. She made a positive in-court identification of the appellant as the black man who took the motorcycle.

On direct examination Joana related that a few days later she saw the appellant at the police station. On cross-examination appellant's counsel established that in the police office she saw a white officer and a black man; that her grandmother said, "That's the man" and that she had agreed.

Victor Rodriquez, Brownsville police officer, then testified for the prosecution that he went to the Besteiro residence on March 16, 1979; that Mrs. Besteiro and a girl told him a black subject, six feet tall, 175 pounds, wearing a brown shirt and black pants, with a short afro haircut had come to the residence in a cab and asked to drive the motorcycle which was for sale. They handed the officer a valid New Jersey driver's license which the man had left with them when he left to test the motorcycle. They told the officer the man did not return with the motorcycle.

The appellant denied the offense and stated that the day of his arrest, March 19, 1979, was the first time he had been in Brownsville.

He testified he lived in Mazatlan, Mexico with his wife and two children. He admitted that in 1961 he had been convicted in California for armed robbery and had spent 13 years in the penitentiary; that he had once escaped from San Quentin; that he had a "lot of connection" with activists George Jackson and Angela Davis; that he had pending charges in California for statutory rape and receiving stolen property.

Appellant related that when released from prison he moved to Mexico and took the name of Arthur Silverton, and may have also used the name of George Bercha. He also adopted the stage name of Esteban de Angel and sang and danced in various clubs in Mexico.

The week before March 16, 1979, he stated he and his wife travelled from Mazatlan to Guadalajara and then flew to Mexico City. They left Mexico City on March 14, 1979 by bus with a friend, Mark Antonio, for Matamoros. Appellant stated he intended to go to Dallas to visit his mother. The bus broke down and they arrived in Ciudad Victoria on March 15, and stayed in hotels there. He spent $2,000 on clothes while there. On March 18, 1979, he, his wife and friend took the bus to Matamoros. On March 19th he changed his pesos into $2,000 of "American money" in Matamoros, and crossed the border. In Brownsville appellant purchased a $300 stereo, but when

he attempted to re-enter Mexico a Mexican customs official wanted $80 before permitting him to cross the border with the stereo. He turned around and was then stopped for questioning by U.S. Customs officials and later was arrested and taken to the Brownsville Police Department at 3 p.m.

Appellant stated while in an office there he heard police call a woman and tell her they had a suspect, and request her to come down for an identification. He stated that when a woman walked into the office she said, "That's him," but that he had never before seen the woman or little girl with her.

Guillermo Salazar, a Mexican citizen, testified he saw appellant in Ciudad Victoria on the night of March 18th and had ridden the bus with him to Matamoros. He did not know where appellant had been on March 16th or 17th.

In *Cole v. State*, 474 S.W.2d 696, 698 (Tex.Cr.App.1972), this court wrote:

"Although identification procedures whereby suspects are viewed singly by a witness rather than as part of a lineup has been widely condemned, *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), due process is not, however, invariably violated by such a procedure. See *Biggers v. Tennessee*, 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267. Here again we note that each case must be considered on its own facts to determine the likelihood that a particular pretrial confrontation resulted in irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967 [971], 19 L.Ed.2d 1247.[2] See also *Archie v. State*, 615 S.W.2d 762 (Tex.Cr.App. 1981)."

■ It must be determined from a totality of the circumstances whether there has been a deprivation of due process. *Stovall*

*v. Denno,* supra; *Perryman v. State,* 470 S.W.2d 703 (Tex.Cr.App.1971).

In *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1975) (involving testimony concerning identification at a pre-trial police station showup), the United States Supreme Court, after noting *Stovall v. Denno,* supra; *Simmons v. United States,* supra; *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), and *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), wrote:

"Some general guidelines emerge from these cases as to the relationship between suggestiveness and misidentification. It is, first of all, apparent that the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.' *Simmons v. United States,* 390 U.S. at 384, 88 S.Ct. 967, 19 L.Ed.2d 1247. While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of 'irreparable' it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself. It is the likelihood of misidentification which violates a defendant's right to due process, and it is this which was the basis of the exclusion of evidence in Foster. Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous. But as Stovall makes clear, the admission of evidence of a showup without more does not violate due process.

"What is less clear from our cases is whether, as intimated by the District Court, unnecessary suggestiveness alone requires the exclusion of evidence. While

---

**2.** In *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Court phrased the test as whether the identification was so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384, 88 S.Ct. at 971. (Emphasis supplied.) The *Stovall*

*v. Denno* (388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199) language was "unnecessarily suggestive) rather than "impermissibly suggestive." The *Stovall* phraseology was subsequently in *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

we are inclined to agree with the courts below that the police did not exhaust all possibilities in seeking persons physically comparable to respondent, we do not think that the evidence must therefore be excluded. The purpose of a strict rule barring evidence of unnecessarily suggestive confrontations would be to deter the police from using a less reliable procedure where a more reliable one may be available, not because in every instance the admission of evidence of such a confrontation offends due process. . . . ”

In *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Court held that reliability is the linchpin in determining the admissibility of identification testimony for confrontations occurring both prior to and after *Stovall v. Denno,* where it was held that the determination depends on the "totality of the circumstances." Factors to be weighed against the corrupting effect of a suggestive identification procedure in assessing reliability are those set out in *Neil v. Biggers,* supra.

In finding the pre-trial police station confrontation in the instant case unnecessarily suggestive,[3] the Court of Appeals made several observations in support of its conclusions.

■ It observed that appellant's counsel had gone to the Besteiro residence the day prior to trial, and that Mrs. Besteiro had identified six of ten photographs as being that of the individual who had taken the motorcycle when only one of the six photographs was that of the appellant. What the court overlooked was that what occurred at the instigation of defense counsel almost three months after the station house confrontation could not affect the suggestiveness of the confrontation at the time it occurred. The testimony went to the weight to be given Mrs. Besteiro's testimony, not its admissibility. Cf. *Clemons v. State,* 505 S.W.2d 582 (Tex.Cr.App.1974).[4]

■ The Court of Appeals also observed that during the trial Mrs. Besteiro couldn't recall whether the man had on a V-neck or round neck shirt at the time the motorcycle was taken, or whether the man's dark colored pants were trousers or blue jeans. Here again, this trial testimony went to the weight rather than to the admissibility, see *Clemons v. State,* supra, and would not affect the suggestiveness of the police station confrontation.

The Court of Appeals relied heavily upon Mrs. Besteiro's testimony concerning the police station confrontation saying "she thought this must be the man." At the suppression hearing Mrs. Besteiro related she entered the office at the police station and immediately saw the man who had taken the motorcycle. She was not shown to have been prompted. On cross-examination the record shows:

"Q So was that Negro—you said, 'He must be the man,' is that right?

"A Yes."

Officer Ochoa testified when Mrs. Besteiro walked into the office she said, "That is the man that took the motorcycle." Officer Tamayo in the next office heard a female voice say, "That is him; that's the one that stole the motorcycle."

At trial Joana on cross-examination stated she told defense counsel that when her grandmother entered the office she said, "That's him." Appellant testified when Mrs. Besteiro entered the office she said, "That's him." The Court of Appeals mischaracterizes and misreads the testimony

**3.** In its opinion the Court of Appeals stated: "Each case must be decided on its own facts in determining the likelihood of whether a particular pre-trial confrontation resulted in *a chance* of irreparable misidentification. *Sutton v. State,* 495 S.W.2d 912 (Tex.Cr.App. 1973); *Cole v. State,* supra." (Emphasis supplied.)
This is, of course, not the proper test, see *Neil v. Biggers,* supra, and the cases cited do not support the court's statement. The court may well have meant "substantial likelihood" rather than "a chance."

**4.** Joana did not identify any of the pictures complaining there were shadows on the pictures. Mrs. Besteiro said the pictures were not clear. The copies of the exhibits in the record certainly are not clear.

arising out of the leading question of defense counsel on cross-examination.

In making its observations, the Court of Appeals pays scant attention to the testimony of Joana Besteiro, testimony identifying appellant, independent of her grandmother's testimony.

The Court of Appeals does point out the police telephoned Mrs. Besteiro and told her they had a suspect and chauffeured her and her granddaughter to the police station. Mrs. Besteiro, however, testified she was under the impression she was to determine if she could identify a motorcycle, and that they had no other means of transportation than the police vehicle.

Officer Ochoa testified there was no lineup because he could not have gotten six black men in Brownsville on March 19, 1979 with similar characteristics as the appellant; that black people were scarce "down here." In footnote # 1 the Court of Appeals stated appellant's counsel later demonstrated that adequate black representation in a lineup or photographic showup could have been arranged if officers had chosen to do so. Reference is obviously to the fact that almost three months later counsel had assembled ten photographs of black men from the Valley area, two of which were of the appellant. The record does not reflect how long it took counsel to obtain the photographs for the purpose of display. On March 19, 1979 the police were faced with a subject who claimed his innocence, stated he lived in Mexico, and had never before been in Brownsville. To have waited until the usual and fair lineup of similar appearing black men could be arranged or photographs obtained could have resulted in an unreasonable delay in the release from the theft charge of a possibly innocent man. Any significant delay could have resulted in a longer time between the crime and the confrontation. Confrontations such as here involved, however, are to be condemned in most cases and should be avoided unless there are exceptional circumstances.

In passing upon the admissibility of the out-of-court identification, the Court of Appeals did not expressly and specifically consider the factors to be weighed against the corrupting effect of a suggestive identification procedure in assessing reliability as set out in *Neil v. Biggers,* supra.

The first factor is the opportunity to view. Both Mrs. Besteiro and Joana testified they talked with the black man who took the motorcycle for about an hour. It was approximately 5 p.m. on a March afternoon and Joana estimated the man was within three or four feet of her during this time. They both had an excellent opportunity to view the individual.

The next factor is the degree of attention. Neither Joana nor her grandmother was a casual or fleeting observer. They discussed with the man his background, his wife and his children and location of his mother. Joana described the man as a "tall, slender, black, a short afro, black pants and a white shirt." She paid enough attention to give a more than ordinary description. Mrs. Besteiro testified the black man wore a tee shirt and dark trousers. She recalled he told them his family came from New Jersey, that he had lived in California, had two children, and his mother lived in Dallas.[5] Officer Rodriquez, who responded to the call on March 16, stated Mrs. Besteiro and the girl had described the subject to him as a six foot, 175 pound black male with a short afro, wearing a brown shirt and black pants. They handed him a valid New Jersey driver's license the subject had left with them. It is obvious that both witnesses paid an adequate degree of attention to the man who took the motorcycle.

The third factor is the accuracy of the description. No claim has been made that the appellant did not possess the physical characteristics as described. See *Manson v. Brathwaite,* 97 S.Ct. at p. 2253. It is true

---

**5.** As earlier noted, the appellant testified he had lived in California, had two children, and his mother lived in Dallas.

that Mrs. Besteiro said the man wore a tee shirt, Joana said a white shirt, and Rodriquez testified he was told a brown shirt, but such descrepancies would not under the totality of the circumstances render the all over description inaccurate.

The fourth factor is the witness' level of certainty. Mrs. Besteiro did not demonstrate a lack of certainty at the station house confrontation, as even the appellant's testimony reflects. It does not appear that Joana was asked to make an identification at the station house. She later testified she saw him there and immediately recognized him.

The fifth and last factor is the time between the alleged crime and the confrontation. The alleged theft occurred about 6 p.m. on Friday, March 16, 1979 and the confrontation was about 5 p.m. on Monday, March 19, 1979. Thus the time between the crime and confrontation was three days. We are not confronted here with a lengthy delay during which a witness may tend to forget the physical characteristics of the perpetrator of the crime.

■ While the identification procedure was unnecessarily suggestive, we conclude, under the totality of the circumstances test, there did not exist a substantial likelihood of misidentification. The due process clause of the Fourteenth Amendment does not compel the exclusion, apart from any consideration of reliability, of pre-trial identification evidence obtained by a police procedure that was both suggestive and unnecessary. *Manson v. Brathwaite,* supra. Unlike a warrantless search, a suggestive identification procedure does not, in itself, intrude upon a constitutionally protected interest. *Manson v. Brathwaite,* supra, 97 S.Ct. at p. 2252, footnote # 13. In the instant case the so-called "out of court" identification was admissible at the trial on the merits.

■ Turning to the in-court identification, we observe that it is well established that, even where the pre-trial identification procedure is impermissibly suggestive, in-court testimony of an identification witness will still be admissible as long as the record clearly reveals that the witness' prior observation of the accused was sufficient to serve as an independent origin for the in-court identification. *Benson v. State,* 487 S.W.2d 117 (Tex.Cr.App.1972); *Guerrero v. State,* 487 S.W.2d 729 (Tex.Cr.App.1972); *Bedford v. State,* 501 S.W.2d 625 (Tex.Cr.App.1973); *Brem v. State,* 571 S.W.2d 314 (Tex.Cr.App.1978); *Thomas v. State,* 605 S.W.2d 290 (Tex.Cr.App.1980); *Turner v. State,* 614 S.W.2d 144 (Tex.Cr.App.1981). See also *Eleby v. State,* 632 S.W.2d 855 (Tex.App., 14th Ct., 1982); *Burton v. State,* 636 S.W.2d 802 (Tex.App., 8th Ct., 1982).

■ From what has been said earlier, Mrs. Besteiro and Joana had an adequate opportunity to view the appellant for about an hour at their home and to engage him in conversation. The record clearly reveals that the witnesses' prior observations of the accused was sufficient to serve as an independent origin for the in-court identifications. The in-court identifications were admissible.

In *Manson v. Brathwaite,* supra, the United States Supreme Court wrote:

"We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury's mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."

Accordingly we reverse the judgment of the Court of Appeals and remand the cause to that court for consideration of appellant's remaining grounds of error.