NUMBER 13-10-00201-CR

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT OF TEXAS

 

                                  CORPUS CHRISTI -
EDINBURG

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



MARK VALENCIA,                                                                        Appellant,

 

v.

 

THE STATE OF TEXAS,                                                                
Appellee.

 

 



On appeal from the 94th District
Court

of Nueces County, Texas.

 

 



 MEMORANDUM OPINION

 

Before Chief Justice Valdez and
Justices Rodriguez and Benavides

Memorandum Opinion by Chief Justice
Valdez

 

            Appellant, Mark Valencia, was charged by
indictment with one count of aggravated assault (“Count 1”), a second-degree
felony, see Tex. Penal Code Ann.
§ 22.02(a), (b) (West Supp. 2010); one count of unlawful possession of a
firearm by a felon (“Count 2”), a third-degree felony, see id. §
46.04(a), (e) (West Supp. 2010); one count of unlawful carrying of a weapon
(“Count 3”), a third-degree felony, see id. § 46.02(a), (c) (West Supp.
2010); and one count of evading arrest (“Count 4”), a state-jail felony.  See
id. § 38.04(a), (b)(1)(A) (West Supp. 2010).[1] 
After the jury found him guilty of the charged offenses, Valencia was sentenced
to:  (1) forty years’ incarceration in the Institutional Division of the Texas
Department of Criminal Justice for Count 1; (2) thirty years’ incarceration for
Counts 2 and 3; and (3) ten years’ incarceration for Count 4.[2]  The sentences
were ordered to run concurrently.  By five issues, Valencia argues that:  (1)
the trial court erred in allowing evidence of a photographic line-up because
the lineup was “impermissibly suggestive and constituted bolstering”; (2) the
trial court erred in charging the jury that he could be found guilty of felony
evading arrest under section 38.04; and (3) the evidence supporting specific
elements of Counts 2, 3, and 4 is insufficient.  We affirm.

I.             
Background

During
the early morning hours on September 4, 2009, Valencia drank beer and watched
exotic dancers with his friend, Rogelio Vasquez, at the Party Place Cabaret (the
“Cabaret”) in Corpus Christi, Texas.  The Cabaret usually closed at 2:00 a.m. 
At 1:45 a.m., Michael Soto, the Cabaret’s night manager, bouncer, and DJ,
announced that “it [was] last call for alcohol.”  The Cabaret stopped selling
alcohol at 1:50 a.m.  At the time of the announcement, approximately ten to
twelve customers remained in the Cabaret, including Valencia and Vasquez.  

Shortly
thereafter, Soto observed Valencia trying to put a twelve-ounce bottle of beer
in the pocket of his jeans.  Soto testified that he “got on the microphone and
I announce, you know, Sir, you know . . . you cannot take the beer, so you
might as well drink it and take it out of your pocket.”  Soto testified that
“[i]t’s illegal for you to take the beer out of the bars.”  Valencia responded
by approaching Soto, who was behind the DJ booth.  Soto recalled the incident as
follows:

He [Valencia] took the beer out of his
pocket and placed it on the table and asked me if the beer was that fucking
important.

 

. . . .

 

I told him, sir, it was just a beer, a
$3.50 beer.  You know, either drink it, throw it away, and it’s time to go.  I
went for the beer and he moved it with his left hand[;] he moved it.  I told
him, sir, it’s just a beer, it’s not that important.  I’m trying to close, you
know, let’s just go ahead and go.  And he kept asking me again, is the beer
that fucking important.  I told him it’s just a beer and I went for the beer
again, then it was already the second time he was gonna [sic] give it up, he
moved it again for a third time.  He asked me one more time, “Is the beer that
fucking important.”  That’s when I raised my hands up and I said, “It’s just a
beer,” and that’s when he pulled the gun out and aimed it right to my chest.  

 

Soto identified the firearm as
either a .40-caliber or nine-millimeter Smith & Wesson handgun.  Soto
further testified that the gun was gray with a black bottom and that he
recognized the make and model of the gun because he owns a similar gun.

            With the gun still
pointed at him, Soto then “made relations” with Valencia and “tried [his] best
to talk [his] way out of it.”[3] 
Valencia and Vasquez then left the Cabaret through the front door.  As he left,
Valencia kept the gun pointed in Soto’s direction.  After Valencia exited the
Cabaret, Soto instructed the remaining customers and Cabaret employees to go to
the dressing rooms, which were towards the back of the Cabaret, in case
Valencia returned.  Soto then went to the front door of the Cabaret and peered
out.  Soto recalled that a police officer had been parked in a lot adjacent to
the Cabaret’s parking lot when he went outside to smoke a cigarette about
twenty minutes earlier.  When he peered out of the front door, Soto saw
Valencia and Vasquez heading towards a pick-up truck.  Soto also saw the police
car still parked in the adjacent lot.  Valencia saw Soto peer out the door and
once again pointed the gun in Soto’s direction.  Soto retreated into the
Cabaret, and when he peered out the door a few seconds later, he saw the
pick-up truck leave the Cabaret’s parking lot.  

            As the pick-up truck
left the Cabaret’s parking lot, Soto flagged the police officer parked nearby
and informed him about the incident.  After speaking with Soto, the police
officer, Lieutenant Tim Brown of the Corpus Christi Police Department, began to
pursue the pick-up truck with his emergency lights activated.  Lieutenant Brown
followed the pick-up along Leopard Street until the driver of the pick-up made
a sharp turn and headed towards the entrance ramp to southbound Interstate 37. 
At no point did Lieutenant Brown observe anything being thrown from the pick-up
truck.  Lieutenant Brown called for backup and continued to follow the pick-up
truck onto Interstate 37 and then on several side streets until they reached a
residential area.  During the pursuit, Lieutenant Brown witnessed the pick-up
truck run “red lights at Agnes and Airport while it was traveling on Old
Robstown Road.”  Officers Norman Morton and Jose Flores responded to Lieutenant
Brown’s call for backup and proceeded to run “parallel” so that they could “join
the pursuit.”  Eventually, the three police cars followed the pick-up truck
into a residential area.  At one point, the pick-up truck slowed down, and the
passenger, Valencia, jumped out and ran on foot.  Officers Morton and Flores
stopped their vehicles and pursued Valencia on foot.  Lieutenant Brown
continued to follow the pick-up truck.    

            With respect to the
pursuit of Valencia on foot, Officer Morton described the scene as follows:

The passenger came out of the car and ran
up the street because it was kind of curbs, I think it’s Gloria or something,
I’m not sure of the name of the street, and [sic] it goes up.  We chased him
probably about 50 yards[,] and while he was running[,] he’s messing with his
pants, kind of pulling his pants up.

 

            Because the call was that the subject was supposed to
have a gun, I backed off him a little bit, drew my Taser deployed the Taser,
got him in the back[,] and he fell to the ground.[[4]]

 

After Valencia fell to the
ground, Officers Morton and Flores arrested Valencia, but they did not observe
a gun on Valencia’s person.[5] 
They did, however, notice that Valencia was wearing blue jeans and had a
laceration on the bottom of his chin as a result of the pursuit and subsequent
tasing.  Police escorted Valencia to the local hospital so that the laceration
could be bandaged.  

            Officer Cortney
Daggett testified that he attempted to join in the pursuit of the pick-up truck
to set up “spike stripes”; however, in attempting to “parallel the pursuit,”
Officer Daggett was unable to continue following.  Instead, he traveled to the
Cabaret to interview witnesses.  Officer Daggett testified that Soto “was
shaken up, he was visibly shaken.”  

According to Lieutenant
Brown, after Valencia received treatment for the laceration on his chin,
Officer Morton took Valencia back to the Cabaret for identification by Soto. 
Soto identified Valencia as the perpetrator, and Valencia was subsequently
taken to the police station.  A couple of weeks later Soto was asked to come to
the police station to identify the gun and the perpetrator from a photographic
line-up.  After reviewing the subjects in the photographic line-up, Soto
identified Valencia as the perpetrator.  Police also asked Estella, Soto’s
girlfriend, to identify the perpetrator from a photographic line-up.  She also
identified Valencia as the perpetrator.  At trial, Valencia objected to the
line-up as “impermissibly suggestive” because the only subject in the line-up
in a white T-shirt was Valencia; because he was the only person with a scrape
on his chin; and because Valencia had a “unique complexion out of every—all the
other individuals.”[6]     


After reviewing the
offense report he created, Officer Daggett stated that once he had spoken with
Soto, he “backtracked where the pursuit had gone and I was looking at ditches
and the grass and median and I ended up finding a bunch of ammunition and a
pistol magazine.”  Officer Daggett noted that he found a .40-caliber Smith
& Wesson handgun, which matched the handgun described by Soto, with twelve
“live .40[-]caliber rounds” on the “37 access road eastbound, just east of
Navigation.  Just a little past the Denny’s on 37.”  Officer Daggett
acknowledged, however, that he never observed the handgun in Valencia’s
possession.  On re-direct examination, Officer Daggett admitted that he
incorrectly recalled the time his discovered the handgun and, instead, asserted
that the handgun was discovered a day after the incident occurred. 

            Antonio Aguilar, an officer with the
Corpus Christi Police Department, testified that he was dispatched to recover a
.40-caliber Smith & Wesson handgun and twelve unfired rounds that had been
found by Mauricio Moreno, a warehouse manager for Contractors Building Supply,
who happened to discover the items while he was mowing the grass.  Moreno
testified that the items were “right at the edge of the grass and the driveway
going into the—our corporate office right there.”  Moreno denied touching the
handgun or unfired rounds and stated that upon discovering the items, he
immediately called the police.  Officer Aguilar confirmed that the handgun and
unfired rounds were found at “5125 IH-37 access, southbound,” which was near a
Denny’s.  On cross-examination, Officer Aguilar admitted that several motels
and establishments where criminals frequented were located near where the
handgun and unfired rounds were found, and he acknowledged that the items that
were found could have been discarded by someone else.    

            Carolyn Martinez, an expert in
firearms and tool-marks employed by the Corpus Christi Police Department, noted
that she conducted fingerprint and ballistics tests on the found handgun and
unfired rounds.  After conducting various tests on the items, Martinez admitted
that “nothing very tangible was obtained as a result of [her] examination” and
that she “didn’t get any development of prints” to conclusively link Valencia
to the handgun and unfired rounds.  A review of records reported by gun dealers
revealed that the gun was sold to Josh Goforth of Corpus Christi; however,
Martinez did not report this information to investigators because it was never
requested.  The records did reveal, however, that the gun had been purchased by
Goforth approximately 181 days before it was discovered; Martinez acknowledged
that “a lot of things can happen in six months with a gun.”  

            The State rested its case-in-chief,
and Valencia subsequently moved for a directed verdict as to Count 4, the
charge of evading arrest, which the trial court denied.  As a part of his
case-in-chief, Valencia called one witness—his sister, Esperanza Valencia. 
Esperanza testified that during the late evening hours of September 3, 2009,
and the early morning hours of September 4, 2009, she was at her mother’s
house.  Esperanza noted that Valencia lived at his mother’s house and that he
left the house at approximately 11:30 p.m. on September 3, 2009 to go out. 
Esperanza recalled that when he left, Valencia was wearing “[a] little tank top
with blue jeans, or a T-shirt.  I don’t know what they’re called, the little
muscle shirts.”  She also recalled seeing Valencia get into a pick-up, though
she could not recall the model or color of the pick-up truck.  

            At the conclusion of the evidence, the
jury convicted Valencia on all four counts and sentenced him to:  (1) forty
years’ confinement for Count 1; (2) thirty years’ confinement for Counts 2 and
3; and (3) ten years’ confinement for Count 4.  The sentences were ordered to
run concurrently.  The trial court certified Valencia’s right to appeal, and
this appeal followed. 

II.           
The
Photographic Line-up

By his first
issue, Valencia contends that the trial court committed reversible error by
allowing evidence of Soto’s pre-trial identification of Valencia by photographs
because the photographic line-up was impermissibly suggestive and constituted
bolstering.

A.   Applicable Law

In-court
identification is inadmissible if tainted by an unduly suggestive pre-trial
identification.  See Loserth v. State, 963 S.W.2d 770, 771 (Tex. Crim.
App. 1998).  In determining whether the trial court erred in admitting an
in-court identification, we employ a two-step analysis, inquiring:  (1) if the
pre-trial procedure was impermissibly suggestive; and (2) if so, whether the
impermissibly suggestive pre-trial procedure gave rise to a very substantial
likelihood of irreparable misidentification at trial.  See Ibarra v. State,
11 S.W.3d 189, 195 (Tex. Crim. App. 1999); Delk v. State, 855 S.W.2d
700, 706 (Tex. Crim. App. 1993); see also Livingston v. State, 739
S.W.2d 311, 334 (Tex. Crim. App. 1987) (“[I]f the line[-]up occurred after
initiation of formal adversarial proceedings or where the confrontation was
found to be ‘so unnecessarily suggestive and conclusive to irreparable mistaken
identification’ that it would deny an accused due process of law, an in-court
identification would not be allowed unless it was shown that the identification
had an origin independent of the challenged confrontation, as viewed by the
totality of circumstances.”).  It is the risk of in-court misidentification
that taints the identification.  See Webb v. State, 760 S.W.2d 263, 269
(Tex. Crim. App. 1988).  The defendant has the burden to show by clear and
convincing evidence that the in-court identification is unreliable.  See
Delk, 855 S.W.2d at 706.  The admissibility of an identification is a mixed
question of law and fact that we review de novo.  See Loserth, 963
S.W.2d at 773.

            In the first step, we
evaluate the pre-trial photo line-up itself to determine whether it was
impermissibly or unduly suggesting.  “A line[-]up is considered unduly
suggestive if other participants are greatly dissimilar in appearance from the
suspect.”  Withers v. State, 902 S.W.2d 122, 125 (Tex. App.–Houston [1st
Dist.] 1995, pet. ref’d) (citing United States v. Wade, 388 U.S. 218,
232-33 (1967)).  A suspect may be greatly dissimilar in appearance from the
other participants because of his distinctly different appearance, race, hair
color, height, or age.  See id. (citing Foster v. California, 394
U.S. 440, 442-43 (1969)).  But minor discrepancies between line-up participants
do not render a line-up impermissibly suggestive.  See id. (citing Partin
v. State, 635 S.W.2d 923, 926 (Tex. App.–Fort Worth 1982, pet. ref’d)). 
The line-up participants need not be identical to satisfy due process requirements. 
See Buxton v. State, 699 S.W.2d 212, 216 (Tex. Crim. App. 1985).

B.   Discussion

Assuming,
without deciding, that the pre-trial identification done via a photographic
line-up was impermissibly suggestive, we conclude that Valencia has failed to
prove by clear and convincing evidence that the alleged impermissibly
suggestive pre-trial procedure gave rise to a very substantial likelihood of
irreparable misidentification at trial.[7] 
See Ibarra, 11 S.W.3d at 195; Delk, 855 S.W.2d at 706; McClenton
v. State, 167 S.W.3d 86, 96-97 (Tex. App.–Waco 2005, no pet.); see also Jackson
v. State, 657 S.W.2d 123, 130 (Tex. Crim. App. 1983) (holding that if the
totality of the circumstances reveals no substantial likelihood of
misidentification, an out-of-court identification will be deemed reliable
regardless of a suggestive pre-trial procedure); Garza v. State, 633
S.W.2d 508, 512 (Tex. Crim. App. 1982) (op. on reh’g) (concluding that the fact
that the show-up procedure was an on-the-scene confrontation conducted shortly
after the crime occurred did not violate defendant’s due process rights; thus,
the identification was admissible).  At trial, evidence was adduced that after
Valencia received treatment for the laceration on his chin, Officer Morton took
Valencia back to the Cabaret and Soto identified Valencia as the perpetrator at
that time.  See Livingston, 739 S.W.2d at 334; see also
Jackson, 657 S.W.2d at 130 (concluding that if the record clearly reveals
that the witness’s prior observation of the accused was sufficient to serve as
an independent origin for the in-court identification, then in-court testimony
of an identification witness is admissible, even where the pre-trial
identification procedure was impermissibly suggestive).  In addition, several
witnesses, including Soto, Estella, and police officers, separately identified
Valencia as the man who pulled a gun on Soto at the Cabaret and subsequently
fled the scene, both in court and out of court.  Thus, the complained-of evidence
was cumulative of other evidence pertaining to the identification of Valencia
as the perpetrator, including evidence regarding the pre-trial photographic
line-up, and the admission of such evidence was harmless.  See Livingston,
739 S.W.2d at 334; see also Matz v. State, 21 S.W.3d 911, 912 (Tex.
Crim. App. 2000) (stating that if other properly-admitted evidence proves the
same facts, any error is harmless); Brooks v. State, 990 S.W.2d 278, 287
(Tex. Crim. App. 1999) (same).  Based on this evidence, we cannot say that
Valencia proved by clear and convincing evidence that there was a substantial
likelihood that witnesses misidentified Valencia as the perpetrator at trial
based upon an alleged impermissibly suggestive pre-trial photographic line-up.

In
addition, Valencia asserts that the admission of evidence pertaining to Soto
and Estella’s pre-trial identification of Valencia through photographic
line-ups constituted improper bolstering.  We first note that Valencia has not
adequately explained on appeal how the admission of such evidence amounted to
improper bolstering.  See Tex. R.
App. P. 38.1(i).  In any event, we note that “bolstering” is no longer a
valid objection where testimony is not deemed to be hearsay.  See Jones v.
State, 833 S.W.2d 634, 635 (Tex. App.–Houston [14th Dist.] 1992, pet.
ref’d); see also White v. State, No. 01-98-00148-CR, 1999 Tex. App.
LEXIS 5072, at *6 (Tex. App.–Houston [1st Dist.] July 8, 1999, no pet.) (mem.
op., not designated for publication).  Texas Rule of Evidence 801(e)(1)(c)
provides that a statement is not hearsay if the declarant testifies at trial,
is subject to cross-examination, and the statement is one of identification of
a person made after perceiving him.  Tex.
R. Evid. 801(e)(1)(c); see Jones, 833 S.W.2d at 635; see also
White, 1999 Tex. App. LEXIS 5072, at *6.  Here, both Soto and Estella
testified at trial and were subject to cross-examination.  In addition, the
complained-of evidence pertains to Soto and Estella’s identification of
Valencia as the perpetrator after perceiving him.  Thus, we reject Valencia’s
bolstering argument.  Accordingly, we overrule Valencia’s first issue.

III.          
Evading
Arrest

In his
second issue, Valencia argues that the trial court erred in charging the jury
that he could be found guilty of felony evading arrest under section 38.04 of
the penal code.  See Tex. Penal
Code Ann. § 38.04.  He also challenges the sufficiency of the evidence
demonstrating that he evaded arrest.[8] 


The
Texas Court of Criminal Appeals has held that our only sufficiency review
should be under "a rigorous and proper application" of the Jackson
standard of review. Brooks v. State, 323 S.W.3d 893, 906 (Tex. Crim.
App. 2010).  Under this standard, "the relevant question is whether, after
viewing the evidence in the light most favorable to the prosecution, any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319
(1979); see Brooks, 323 S.W.3d at 902 n.19.  "[T]he fact-finder's
role as weigher of the evidence is preserved through a legal conclusion that
upon judicial review all of the evidence is to be considered in the
light most favorable to the prosecution."  Jackson, 443 U.S. at 319
(emphasis in original); see also Tex.
Code Crim. Proc. Ann. art. 38.04 (Vernon 1979) (The jury, in all cases,
is the exclusive judge of facts proved and the weight to be given to the
testimony . . . ."); Wesbrook v. State, 29 S.W.3d 103, 111 (Tex.
Crim. App. 2000) ("The jury is the exclusive judge of the credibility of
witnesses and of the weight to be given testimony, and it is also the exclusive
province of the jury to reconcile conflicts in the evidence.").

Sufficiency
of the evidence is measured by the elements of the offense as defined by a
hypothetically correct jury charge.  Villarreal v. State, 286 S.W.3d
321, 327 (Tex. Crim. App. 2009).  "'Such a charge [is] one that accurately
sets out the law, is authorized by the indictment, does not unnecessarily
increase the State's burden of proof, or unnecessarily restrict the State's
theories of liability, and adequately describes the particular offense for which
the defendant was tried.'"  Id. (quoting Malik v. State, 953
S.W.2d 234, 240 (Tex. Crim. App. 1997)).

Section
38.04(a) provides that an individual commits the offense of evading arrest “if
he intentionally flees from a person he knows is a peace officer attempting to
lawfully arrest or detain him.”[9] 
Tex. Penal Code Ann. § 38.04(a). 
With regard to punishment, section 38.04(b)(1) states that the offense of
evading arrest is a class A misdemeanor, unless the actor “has been previously
convicted under this section” or the actor “uses a vehicle while the actor is
in flight and the actor has not been previously convicted under this section,”
in which case the offense becomes a state-jail felony.  Id. § 38.04(b).

The
State tendered a copy of the judgment indicating that on June 7, 2004, Valencia
had been previously convicted of evading arrest under section 38.04 of the penal
code.[10] 
Pursuant to section 38.04(b)(1), Valencia’s conviction for evading arrest in
this case would constitute a state-jail felony because of his prior conviction
for evading arrest.[11] 
Id.  Thus, it does not matter whether the evidence established that
Valencia evaded arrest “while using a vehicle.” 

Officer Morton
testified that on the night in question, Valencia exited a moving vehicle and
ran from police.  Officer Morton instructed Valencia to “Stop, Police”;
however, Valencia continued to run until Officer Morton deployed his taser.  Reviewing
the evidence in the light most favourable to the prosecution, we conclude that
a rational juror could have concluded that Valencia evaded arrest under section
38.04 for a second time; thus, we hold that the evidence is sufficient to support
Valencia’s conviction for felony evading arrest.  See id.; see also Jackson,
443 U.S. at 319; Brooks, 323 S.W.3d at 906.  Accordingly, we overrule
Valencia’s second issue.

IV.         
Proof
that Valencia Fled from Lieutenant Brown

By his
third issue, Valencia asserts that the record contains no evidence that he fled
from Lieutenant Brown on the night in question, as was alleged in the
indictment, because he was merely a passenger in the truck driven by Vasquez.[12]  In making
this argument, Valencia devotes two small paragraphs of his brief to the issue,
and he does not cite to any authority to support his contention.  As such, we
conclude that this issue was inadequately briefed.  See Tex. R. App. P. 38.1(i).   

Nevertheless,
even if this issue had been adequately briefed, we disagree with Valencia’s
contention.  The record reflects that Valencia left the Cabaret while pointing
a gun at Soto.  Valencia then got into a pick-up truck driven by Vasquez.  The
passengers in the pick-up truck proceeded to lead police on a ten-minute
pursuit around Corpus Christi.  Lieutenant Brown first pursued the pick-up
truck as it left the Cabaret’s parking lot.  Further, the emergency lights on
Lieutenant Brown’s patrol car were activated during the pursuit so as to notify
the occupants of the pick-up truck to stop.  The evidence demonstrates that
Valencia used the pick-up truck driven by Vasquez to flee police, a conclusion
that is supported by the fact that once he exited the truck, Valencia continued
to run away from police.  See Tex.
Penal Code Ann. § 38.04(b)(1)(B) (providing that an actor need only use
a vehicle to evade arrest, rather than be the driver of the vehicle); see
also Jones v. State, No. 05-09-00114-CR, 2010 Tex. App. LEXIS 157, at **1-6
(Tex. App.–Dallas Jan. 12, 2010, no pet.) (mem. op., not designated for
publication) (affirming appellant’s conviction for evading arrest, even though
appellant was not the driver of the vehicle that fled from law enforcement); Marron
v. State, No. 01-02-00601-CR, 2003 Tex. App. LEXIS 3581, at **9-11 (Tex.
App.–Houston [1st Dist.] Apr. 24, 2003, no pet.) (mem. op., not designated for
publication) (same).[13] 
We overrule Valencia’s third issue.   

V.          
Unlawful
Possession of a Firearm by a Felon

In his fourth
issue, Valencia contends that the evidence supporting his conviction for
unlawful possession of a firearm by a felon is insufficient.  Specifically,
Valencia argues that there is no evidence indicating that he “was convicted of
an offense within five years of the date of the charged offense.”  In his
brief, Valencia does not provide any citations to the record, nor does he cite
any authority supporting his contentions.  As a result, we conclude that this
issue has been inadequately briefed.  See Tex. R. App. P. 38.1(i).

VI.         
Unlawful
Carrying of a Weapon

By his
fifth issue, Valencia contends that there is no evidence that he carried a
firearm on a licensed premise.  See Tex.
Penal Code Ann. § 46.02(a).  Specifically, he argues that “there was no
admissible evidence that the bar was licensed.”  We disagree.

The
penal code provides that a person commits the offense of unlawfully carrying a
weapon if:

the person intentionally, knowingly, or recklessly carries on or
about his or her person a handgun, illegal knife, or club if the person is not:

 

(1) 
on the person’s own premises or premises under
the person’s control; or

 

(2) 
inside of or directly en route to a motor
vehicle that is owned by the person or under the person’s control.

 

Id.

            Here, the State
tendered a copy of the Cabaret’s liquor license purportedly issued by the Texas
Alcoholic Beverage Commission (the “TABC”), which was designated as State’s
exhibit 27.  Relying on Texas Rule of Evidence 902, Valencia asserts that the
license “was not properly authenticated or admitted.”  See Tex. R. Evid. 902 (listing types of
documents that can be self-authenticating).  He further notes that the
purported liquor license is void, has no seal, and “is not attested to by any
official or agent of the [T]ABC certifying that fact.”  

Several
witnesses testified that the Cabaret was licensed by the TABC to sell liquor. 
Moreover, the license itself contains a signature of an “Administrator” for the
TABC.  The copy of the licensed tendered by the State does contain imprints of
the word “VOID” in various places on the license; however, this notation likely
exists because the exhibit is a copy of the actual license.  The “VOID”
notation is designed to prevent unauthorized replication of the license. 
Because several witnesses testified that the Cabaret was licensed by the TABC
at the time of the incident, we need not reach Valencia’s arguments pertaining
to the validity of State’s exhibit 27.  This is so because State’s exhibit 27
is cumulative of other evidence in the record.  See Matz, 21 S.W.3d
at 912; Brooks, 990 S.W.2d at 287.  Therefore, any error associated with
the admission of the purported liquor license is harmless.  See Matz,
21 S.W.3d at 912; Brooks, 990 S.W.2d at 287.

In any
event, we also note that, in applying the Jackson standard of review, an
appellate court considers all the evidence admitted before the jury, including
which was admitted properly and that which may have been admitted improperly.  See
Moff v. State, 131 S.W.3d 485, 488 (Tex. Crim. App. 2004); see also
Thomas v. State, 753 S.W.2d 688, 695 (Tex. Crim. App. 1988).  The court of
criminal appeals has stated that:

We first note that in reviewing the
sufficiency of the evidence, the appellate court must look at all the evidence,
whether properly or improperly admitted.  In the event a portion of the
evidence was erroneously admitted, the accused may complain on appeal of such
error.  The admission of inadmissible evidence is considered trial error and
thus the proper remedy is to reverse the conviction and remand for a new
trial.  But jurors do not act irrationally in taking such evidence into
account, since they are bound to receive the law from the trial judge.  All
evidence which the trial judge has ruled admissible may therefore be weighed
and considered by the jury, and a reviewing court is obligated to assess the
jury’s factual findings from this perspective.

 

Miles v. State, 918 S.W.2d 511, 513 (Tex. Crim. App. 1996) (internal quotations
& citations omitted); see George
E. Dix & Robert O. Dawson, 43A
Texas Practice, Criminal Practice and Procedure § 43.531, at 742 (2d ed.
2001) (“[A]n appellant . . . is not entitled to have an
appellate court first consider the appellant’s complaints concerning improper
admitted evidence and, if it resolves any of those in favor of the appellant,
to then, second, consider the sufficiency of the properly-admitted
evidence to support the conviction.”) (emphasis in original).  The impetus
behind this rule is “the unfairness of barring further prosecution where the
State has not had a fair opportunity to prove guilt.  A trial judge’s
commission of trial error may lull the State into a false sense of security
that may cause it to limit its presentation of evidence.”  Moff, 131
S.W.3d at 490.

            As noted earlier,
several witnesses testified that the Cabaret is licensed to sell alcoholic beverages
in the State of Texas.  Moreover, aside from his authentication contention
regarding State’s exhibit 27, Valencia does not argue that a rational juror
could not accept the witnesses’ testimony or State’s exhibit 27 as proof beyond
a reasonable doubt that the Cabaret is a licensed premises.  Thus, we conclude
that the evidence supporting that element of the State’s case is sufficient,
and we overrule Valencia’s fifth issue.  See Tex. Penal Code Ann. § 46.02(a); see also Romero v. State,
No. 07-06-0198-CR, 2008 Tex. App. LEXIS 4221, at **10-13 (Tex. App.–Amarillo
June 11, 2008, no pet.) (mem. op., not designated for publication) (concluding
that the testimony of a police officer regarding whether a bar is licensed was
sufficient to support the jury’s finding that the bar is a licensed premises).

 

VII.        
Conclusion

Having
overruled all of Valencia’s issues, we affirm the judgment of the trial court.

____________________

Rogelio Valdez

                                                                                                Chief
Justice

 

Do not
Publish. 

Tex. R. App. P. 47.2(b)

Delivered and filed the


19th day of May, 2011.

 









[1] The indictment
further alleged that Valencia had been previously convicted of evading arrest
on June 7, 2004, which enhanced the evading arrest count to a state-jail
felony.  See Tex. Penal Code Ann.
§ 38.04(b)(1)(A) (West Supp. 2010).  In addition, each of the allegations made
in the indictment were further enhanced by Valencia’s prior convictions for: 
(1) first-degree felony murder on January 8, 1988; and (2) unlawful possession
of cocaine, a second-degree felony, on September 9, 1997.  Thus, the enhanced
punishment range for Counts 1-3 was “life, or for any term not more than 99
years or less than 25 years,” and Count 4 was enhanced to a second-degree
felony with a punishment range of two to twenty years.  See id. §§
12.33(a), 12.42(a)(2), (d) (West Supp. 2010).

  





[2] A deadly weapon
finding as to Count 1 was also made.





[3] Soto’s
girlfriend, Estella Martinez, the Cabaret’s door girl, corroborated Soto’s
testimony about Valencia’s brandishing of a gun in the Cabaret.  

 





[4] Officer Morton
further testified that before deploying his taser, he shouted “Stop, Police” to
Valencia, but Valencia continued to run from them.

 





[5] Officers
testified that the pursuit lasted approximately ten minutes.

 





[6] The record
indicates that all of the subjects in the photographic line-up had a black bar
placed over their chins so as to obscure the fact that Valencia had a scrape on
his chin.





[7] In Jackson v.
State, the court of criminal appeals noted that:

 

A defendant who
contends on appeal that a trial court erred in allowing an in[-]court
identification of him by a complaining witness has a difficult and heavy burden
to sustain, for unless it is shown by clear and convincing evidence that a
complaining witness’ in[-]court identification of a defendant as the assailant
was tainted by improper pre-trial identification procedures and confrontations,
the in[-]court identification is always admissible.

 

628 S.W.2d 446, 448 (Tex. Crim. App. 1982).





[8] Count 4 of the
indictment originally alleged that Valencia had evaded Lieutenant Brown “while
using a vehicle”; however, the indictment was amended on March 1, 2010, to omit
that language.





[9] "A person acts intentionally, or with
intent, with respect to the nature of his conduct or to a result of his conduct
when it is his conscious objective or desire to engage in the conduct or cause
the result."  Tex. Penal Code Ann.
§ 6.03(a) (Vernon 2003).  Intent may "be inferred from circumstantial
evidence[,] such as acts, words, and the conduct of the appellant."  Guevara
v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); see Hart v. State,
89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (stating that a fact-finder may infer
both knowledge and intent from the defendant's acts, words, or conduct and from
the nature of the wounds inflicted on the victim); Hernandez v. State,
819 S.W.2d 806, 810 (Tex. Crim. App. 1991); Ledesma v. State, 677 S.W.2d
529, 531 (Tex. Crim. App. 1984) (noting that the requisite culpable mental
state may be inferred from the surrounding circumstances).

 





[10] The record also
contains a second judgment indicating that Valencia was convicted of another
instance of evading arrest on July 22, 2004.

 





[11] The evading arrest
count was further enhanced to a second-degree felony by evidence of Valencia’s
prior felony convictions for murder and unlawful possession of cocaine.  See
Tex. Penal Code Ann. §
12.42(a)(2).

 





[12] Count 4 of the
indictment specifically provides that Valencia “on or about SEPTEMBER 4,
2009 . . . did then and there intentionally flee from Tim Brown,
a person the defendant knew was a peace officer who was attempting lawfully to
arrest or detain the defendant . . . .”





[13] In Marron,
the First Court of Appeals, in concluding that the evidence supporting appellant’s
conviction for evading arrest was sufficient, noted the following facts, which
are strikingly similar to the facts in this case:

 

The record shows that
the car in which appellant was riding was being pursued by two patrol cars with
activated lights and sirens at the time that appellant allegedly attempted to
evade arrest.  While being pursued, the driver fled the moving car.  As soon as
it was safe to do so, appellant also jumped out of the car and was attempting
to get up when he was seized by Deputy Brown.  After appellant jumped out of
the car, but before he was seized, he was facing the opposite direction from
the deputies and ignored their commands to stay down on the ground.

 

Marron v. State, No. 01-02-00601-CR,
2003 Tex. App. LEXIS 3581, at *10 (Tex. App.–Houston [1st Dist.] Apr. 24, 2003,
no pet.) (mem. op., not designated for publication).